**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------X

ANDREA SMITH-TAYLOR; TYQUAN BLOUNT; NYGEE ROGERS-GREEN; ERIC LAWSON; ISAIAH RASHAD; TRAVAY BEST,

*Plaintiffs*,

**CLASS ACTION COMPLAINT**

- against -

**1:26-CV-09250**

THE CITY OF NEW YORK; The PROPERTY CLERK of the NEW YORK CITY POLICE DEPARTMENT; JESSICA S. TISCH, Police Commissioner for the City of New York, in her official capacity,

JURY TRIAL DEMANDED

*Defendants*.

----------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1. Each year, hundreds of thousands of New Yorkers have their property seized by the New York City Police Department ("NYPD") in connection with an arrest of an alleged crime or as a witness or victim of an alleged crime. Those seeking its return are thrust into a bureaucratic scavenger hunt riddled with contradictory instructions, arbitrary requirements, and dead ends. This process is so convoluted that a court in this District previously likened it to a "Kafkaesque odyssey." *Tammaro v. City of New York*, No. 13-cv-6190 (WHP), 2018 WL 1621535, at *2 (S.D.N.Y. Mar. 30, 2018).

2. The full weight of navigating this broken system falls on the people seeking their property. They must decipher which combination of unclear procedures applies to their situation, travel across boroughs to precincts, Property Clerk offices, and distant warehouses, often only to discover that their belongings have already been destroyed, sold, or simply lost. With no clear guidance and no mechanism for accountability, the process functions less like a path to reclaim

property and more like a system designed to ensure claimants[1] never get it back. The result is that most claimants are deprived of their property for months and years, if not permanently.

3. Over fifty years ago, the Second Circuit held that the statute governing NYPD property seizure and forfeiture, New York City Administrative Code § 14-140, [2] was unconstitutional as a violation of the Due Process Clauses of the Fifth and Fourteenth Amendments. *McClendon v. Rosetti*, 460 F.2d 111, 116 (2d Cir. 1972).

4. For over fifty years, the City of New York (the "City") has ignored that holding. Three decades after the Second Circuit's decision, the City attempted to codify a new property return procedure through Title 38, Chapter 12 of the Rules of the City of New York (the "City Rules"). But it left the unconstitutional § 14-140 on the books, creating a dual, conflicting framework that continues to mislead claimants and insulates officials from accountability for prolonged or wrongful property seizure.

5. Since *McClendon*, the Second Circuit and district courts therein have repeatedly recognized the constitutional infirmities at the heart of the City of New York's property return rules. *See, e.g.*, *Alexandre v. Cortes,* 140 F.3d 406, 413 (2d Cir. 1998); *Butler v. Castro*, 896 F.2d 698, 702–03 (2d Cir. 1990); *Tammaro*, 2018 WL 1621535, at *9; *Sommerville v. Wright*, No. 12-cv-165 (KAM), 2014 WL 794275, at *8 (E.D.N.Y. Feb. 25, 2014); *Maxineau v. City of New York*, No. 11-cv-02657 (ENV), 2013 WL 3093912, at *10 (E.D.N.Y. June 18, 2013); *Frith v. Hill*, No. 07-cv-5899 (JSR), 2009 WL 3073716, at *5, *12 (S.D.N.Y. Sept. 23, 2009); *Palacio v. City of*

[1] In this Complaint, claimant will have the meaning as defined in § 12-31, tit. 38, of the Rules of the City of New York. 38 RCNY § 12-31 ("The term 'claimant' shall mean the person from whose person or possession property, other than contraband, was taken or obtained, who is seeking from the police property clerk the return of such property in the police property clerk's possession or property that has been transferred by the police property clerk to the district attorney of any of the five counties of the city.").

[2] The statute governing property seizure and forfeiture was enumerated as New York City Administrative Code § 435-4.0 at that time but otherwise identical in substance.

*New York*, 489 F. Supp. 2d 335, 341 (S.D.N.Y. 2007); *McClendon v. Rosetti,* No. 70-cv-3851 (MEL), 1993 WL 158525, at *1 (S.D.N.Y. May 12, 1993).

6. The City has failed to fully update and implement the City Rules consistent with these repeated judicial mandates for improved due process in the property seizure and return process. In violations of these mandates, the City Rules continue to place the entire burden of retrieval on the claimant, fail to require clear notice of retrieval procedures, and lack an enforcement mechanism to ensure compliance by officials.

7. Further, the NYPD systematically disregards one of the most fundamental requirements established by *McClendon* and its progeny: the obligation to issue a property invoice to every person whose belongings are seized.[3]

8. Invoices are seldom issued when property is seized, and even when they are, they provide inadequate instructions on how to recover belongings, leaving people uninformed and effectively powerless to retrieve their property from the outset.

9. As a result of both regulatory flaws and pattern-based due process violations, New Yorkers are routinely deprived of essential personal property such as cell phones, vehicles, cash, personal documents, and irreplaceable belongings. Claimants are often deprived of their property not because they lack lawful entitlement, but because the process for reclaiming it is so labyrinthine, time-intensive, and burdensome that it rarely results in the return of the property.

10. People lose immigration documents that can put them at risk of deportation or cost hundreds of dollars to replace. They get evicted from their homes while waiting months for the

[3] Although the City Rules refer to the receipt for property seized as a "voucher," NYPD refers to the same document as an "invoice." These terms have since become interchangeable. For continuity, we use the term "invoice" to refer to this document.

return of money they had counted on to pay rent. They lose sentimental or heirloom jewelry, or cars they spent their life savings to purchase in the hope of expanding their job opportunities.

11. When this deeply meaningful property is not returned, it is typically destroyed or auctioned to the public on the commercial website PropertyRoom.com, with the rightful owner receiving no notice that their belongings and assets are being liquidated.




Figure 1: *Online Auctions for Jewelry, Watches, Coins & Bullion, Electronics, Fashion, Fine Art, Vehicles, Cars and More! Great Deals, Buy Now*, PropertyRoom.com, https://www.propertyroom.com (last visited June 5, 2026).




Figure 2: *Online Auction Deals – Auction Fun. Trusted Deals.*, Property Room, https://www.propertyroom.com/c/propertyroom (last visited June 5, 2026).

12. Upon information and belief, the proceeds from such sales are directed, in whole or in part, to NYPD accounts, programs, or initiatives, creating a direct financial incentive for the NYPD to withhold and dispose of personal property rather than return it.

13. For these reasons, named Plaintiffs Andrea Smith-Taylor, Tyquan Blount, Nygee Rogers-Green, Eric Lawson, Isaiah Rashad, and Travay Best, on behalf of themselves and a putative class of similarly situated individuals, seek damages and injunctive and declaratory relief to end the abuses caused by these policies and practices, which violate their rights, privileges, and immunities secured by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, the New York State Constitution, and the laws of the State and City of New York.

## PARTIES

14. Plaintiff Andrea Smith-Taylor was residing in New York, New York at all relevant times to this action. On Christmas Eve, 2024, the NYPD arrested her in New York County and

seized two large bags of Christmas gifts she had bought for her children, her money, and other personal belongings. The NYPD did not create or provide her with an invoice for these belongings. Ms. Smith-Taylor attempted to retrieve her property many times, but the NYPD never returned it.

15. Plaintiff Tyquan Blount was a resident of Troy, New York and Brooklyn, New York at all relevant times to this action. As a victim, the NYPD seized his phone, sentimental jewelry, clothing, and a knee brace on May 20, 2024. It took two years and assistance of counsel to obtain the return of many of those items; others remain unreturned. Mr. Blount was later arrested in Brooklyn, New York on August 17, 2024, and the NYPD seized his vehicle and its ownership documents and then sent his vehicle to auction. The NYPD never provided Mr. Blount with invoices at the time of these seizures.

16. Plaintiff Nygee Rogers-Green is currently a resident of New Jersey. He was arrested in Brooklyn, New York on October 11, 2025. His vehicle was seized at arrest and, despite attempting to retrieve it, the NYPD never returned it to him. Body-worn camera footage shows NYPD officers removing his belongings from inside his vehicle, throwing them on the ground, and later placing them into clear plastic bags. The NYPD never created an invoice for these belongings, which included virtually all his personal effects as he was living in shelter at the time and storing his belongings in his car. Instead, Mr. Rogers-Green later found many of them near a dumpster outside the precinct.

17. Plaintiff Eric Lawson was a resident of Queens, New York at all relevant times to this action. On October 22, 2023, he was arrested, and his hat, AirPods, a ring, and cell phone were seized from his person during the arrest. The NYPD invoiced his ring and cell phone but failed to invoice his hat and AirPods. Because of the category under which the NYPD invoiced the cell phone, there was no procedure by which Mr. Lawson could seek its return. The cell phone was

destroyed, and the NYPD auctioned off his ring, both three years after seizure with no notice or opportunity for Mr. Lawson to seek their return.

18. Plaintiff Isaiah Rashad was a resident of Brooklyn, New York at all relevant times to this action. He was arrested in Brooklyn, New York on June 26, 2024, inside a borrowed vehicle that was seized during his arrest along with everything inside it. The NYPD created an invoice for most of his belongings inside of the vehicle but discarded all his belongings before providing Mr. Rashad with that invoice. This discarded property comprised 217 items including two computers, clothing and shoes, a blanket, car keys, and more.

19. Plaintiff Travay Best is currently a resident of Kentucky and was a resident of Maryland when he was arrested in Brooklyn, New York on May 13, 2025. At arrest, his vehicle was seized with many of his belongings inside. The NYPD discarded all the belongings from inside his vehicle without providing Mr. Best with an invoice, including a backpack, flash drive with documents, student ID, school papers, and clothing.

20. Defendant City of New York (the "City" or "New York City") is a municipal corporation duly incorporated in New York State. Defendant New York City established, maintains, and operates a police department, the New York Police Department ("NYPD"), as a constituent department or agency. Defendant New York City is responsible for the policies, customs, practices, hiring, training, and supervision of the NYPD and for ensuring that NYPD personnel obey the laws and constitutions of the United States, the State of New York, and the City of New York. The City of New York maintains its main office at City Hall Park in New York, New York.

21. Defendant Property Clerk of the NYPD ("NYPD Property Clerk") is the entity responsible for accepting, cataloguing, and safeguarding property as well as storing, producing as

required for court, and ultimately returning or otherwise disposing of all property coming into the custody of the NYPD. This includes property used as evidence in criminal cases, property accepted for safekeeping, found property, decedent's property, prisoner's property, property no longer needed as evidence or for further investigation, contraband, seized peddler property pending release, serological evidence, and property confiscated for forfeiture proceedings. There are several Property Clerk locations across the boroughs.

22. Defendant Jessica S. Tisch is the Police Commissioner of the City of New York ("Commissioner Tisch"). As Commissioner of the NYPD—an agency of the City of New York—Defendant Tisch has final authority to promulgate and implement administrative and managerial policies and procedures of the NYPD, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties. Commissioner Tisch is a New York City policymaker for whom Defendant New York City is liable with respect to the NYPD. NYPD headquarters is located at 1 Police Plaza, New York, New York 10038. She is sued in her official capacity.

## JURISDICTION AND VENUE

23. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1343, which provides for original jurisdiction over all actions brought pursuant to 42 U.S.C. § 1983, and by 28 U.S.C. § 1331, which provides jurisdiction over all cases brought pursuant to the Constitution and laws of the United States.

24. Jurisdiction is proper over Plaintiffs' New York City and State law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

25. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2) because the defendant entities maintain their principal places of business in this District.

## LEGAL AND FACTUAL BACKGROUND

26. The property seizure and return system in New York City is widely recognized for its complex statutory schemes, chronic administrative failures, and the significant harm it causes. It functions less to return property than to ensure its permanent loss.

27. When someone is arrested, the NYPD takes possession of any property on their person, in their vehicle, or sometimes in their immediate surroundings. They assign it to a particular property seizure category and owner, determined by the NYPD. The procedures for recovering property eligible to be returned, or non-contraband property,[4] depend on the type of non-contraband property seized and the property seizure category assigned. Because the governing rules do not include all property seizure categories or property types and do not clearly or consistently explain how property is categorized or what steps a claimant must take to recover it, navigating the process is virtuallyimpossible. A claimant who fails to decipher the correct procedure within a certain time frame will ultimately lose the property altogether, as it may be discarded, destroyed, or sold by the NYPD.

28. The procedural, structural, and administrative failures of such a byzantine system are widespread but can be summarized in four main categories.

29. *First*, the original governing statute of property seizure in New York City, Administrative Code § 14-140, has been ruled unconstitutional, yet remains unrepealed and

[4] Property deemed contraband is not eligible to be returned, although there are no written rules on the subject.

continues to be cited in civil forfeiture proceedings and other property seizure litigation. *See infra* ¶¶ 34–45.

30. *Second*, without repealing § 14-140, the City added Chapter 12 of Title 38 to the City Rules. These Rules, also constitutionally inadequate, now conflict with § 14-140 while imposing new barriers and lacking meaningful notice requirements that leave claimants mired in overlapping and contradictory procedures. *See infra* ¶¶ 46–78.

31. *Third*, the City agencies involved in this property seizure scheme—namely the NYPD and New York District Attorneys' Offices—have developed largely unpublished and fluctuating internal procedures, inventing their own property categories and practices that operate outside the City Rules. *See infra* ¶¶ 79–96.

32. *Fourth*, the NYPD routinely fails to comply with not only the City Rules, but also their own internal procedures, including by failing to issue or correct property invoices, resulting in a lack of notice and the arbitrary retention or destruction of personal belongings. *See infra* ¶¶ 97–108.

33. These constitutional violations become evident when detailing the various retrieval processes for currency, general property, and vehicles, exposing the confusion, attrition, and millions of dollars in unreturned property that NYPD retains each year. *See infra* ¶¶ 109–150.

## I. The City Has Ignored Repeated Judicial Findings of Due Process Violations in Property Seizure Regulations and Practices for Decades.

34. For over five decades, federal courts have repeatedly found that New York City's property seizure scheme violates due process.

35. Administrative Code § 14-140 historically governed property seizure and forfeiture, authorizing the NYPD Property Clerk to seize and dispose of property believed to be connected to unlawful activity.

36. Section 14-140 allows the deprivation of property without notice and places the burden on claimants to establish both their right to and lawful possession of the property, even following acquittal or dismissal. Courts have condemned these procedures as "shocking," and as showing "a studied indifference to the rights of the public." *United States v. Herzfeld*, 271 F. Supp. 185, 189 (S.D.N.Y. 1967) (quoting *Gonzales v. Leuci*, 120 (85) N.Y. L.J., Nov. 1, 1948, at 993, col. 4); *McClendon*, 460 F.2d at 116 (citing *Country-Wide Ins. Co. v. Rosetti*, N.Y.L.J., July 17, 1970, at 8 (N.Y.Civ.Ct.)).

37. In 1972, in *McClendon*, the Second Circuit held that § 435-4.0 (now § 14-140) violated constitutional due process by (1) not providing meaningful notice for property recovery, and (2) placing the burden to initiate recovery proceedings and establish lawful ownership on the claimant. 460 F.2d at 114–16.

38. In an order entered in 1974, Judge Morris E. Lasker outlined new procedures to govern the NYPD Property Clerk's custody of seized property. *McClendon v. Rosetti,* 70-cv-3851 (MEL) (S.D.N.Y. July 15, 1974) (unpublished order) (the "Lasker Order"); *see also Butler*, 896 F.2d at 701 n.1 (quoting the Lasker Order). The Lasker Order mandated that a voucher be given for non-contraband property seized, and that the back of the invoice provide instructions on how to recover the property. *Id.*

39. The Administrative Code was never amended to incorporate those procedures—a failure that did not go unnoticed by the courts. *See Butler*, 896 F.2d at 701–02; *Property Clerk, N.Y.C. Police Dep't v. Seroda*, 131 A.D.2d 289, 295 (1st Dep't 1987) ("In passing, we note the absence of any ameliorative legislation with respect to Administrative Code § 14-140 in the more than 13 years since the entry of the *McClendon* order. This would seem to be a matter worthy of legislative attention.").

40. Nearly eighteen years later, in *Butler*, the Second Circuit again condemned the City's failure to amend § 14-140, holding that the statute's continued existence misled claimants about their rights and therefore failed to satisfy due process standards. 896 F.2d at 703–04.

41. The *Butler* court reasoned that—particularly when vouchers are not provided—the City's continued failure to amend § 14-140 gives claimants no notice of the Lasker Order procedures and instead leads them to believe that only the unconstitutional § 14-140 procedures govern. *Id.* at 703.

42. Only in 1992 did the City finally respond by adopting Chapter 12 of Title 38 of the Rules of the City of New York (the "City Rules"). These City Rules, in relevant part, attempted to establish a procedure for the disposition of property held by the NYPD Property Clerk and set forth a method by which notice of these procedures must be given to claimants.

43. However, the Second Circuit has since questioned whether the pertinent City Rules provide adequate notice of the procedures to claimants and has held that there is a genuine dispute as to whether the invoice contains the information necessary to satisfy the notice requirements of Due Process. *See Alexandre*, 140 F.3d at 412–14 (vacated and remanded to decide a material issue of fact).

44. As recently as 2018, Judge William H. Pauley III in this District expressed serious doubt that the pertinent City Rules satisfy due process, describing them as a "morass of regulations" that foreseeably mislead people whose property is seized about the procedures to follow. *Tammaro*, 2018 WL 1621535, at *9.

45. To this day, § 14-140 remains on the books, unrepealed and unchanged, creating a legal conflict and depriving claimants of notice of process. Courts in this Federal Circuit and District have repeatedly observed or held that by refusing to correct the Administrative Code, the

City systematically misleads claimants about the procedures for reclaiming their property. *See, e.g.*, *Alexandre*, 140 F.3d at 413; *Butler,* 896 F.2d at 701–04; *Tammaro,* 2018 WL 1621535, at *7 & n.5, *8; *Frith v. City of New York*, No. 07-cv-5899 (JSR), 2011 WL 3477083, at *5–6 (S.D.N.Y. July 7, 2011).

## II. In Addition to the Statutory and Regulatory Conflict, the City Rules Lack Due Process.

46. Chapter 12 of Title 38 of the City Rules, adopted in an attempt to cure the constitutional defects of § 14-140, instead continues to provide insufficient notice and places the burden of property retrieval on claimants, while imposing a degree of complexity that renders the City Rules incomprehensible.

47. The City Rules define certain property seizure categories, which determine "the documentation the claimant must provide in order to gain possession." 38 RCNY § 12-01.

48. The Rules define safekeeping property, arrest evidence, and forfeiture property, as well as categories unrelated to a criminal proceeding such as peddler's property and found property.

49. The rules indirectly define forfeiture property through § 12-36, which provides that "[w]here the property clerk has reasonable cause to believe that property was unlawfully obtained or was the proceeds or instrumentality of a crime or otherwise may be subject to forfeiture under any applicable provision of law," specified time limitations will apply for the commencement of a civil forfeiture proceeding. 38 RCNY § 12-36.

50. There is no explanation of how property held under the forfeiture category may be recovered.

51. In practice, recovery procedures for property held for forfeiture vary depending on the type of property involved: currency or vehicles. Currency requires a lengthy and multi-step

process with a Property Clerk office, while vehicles require negotiating with the NYPD Civil Enforcement Unit attorneys, often by unrepresented claimants.

52. The Rules define "arrest evidence" as property taken from the person or possession of an individual before, during, or after an arrest because of its relationship to the matter for which the individual was arrested. *See* 38 RCNY § 12-31. Section 12-35 then takes eight subsections and a series of convoluted demand timelines that are no longer used in practice to instruct the Property Clerk to return arrest evidence if provided with a District Attorney Release from a claimant.

53. The Rules define safekeeping property as "personal property not required as evidence." 38 RCNY § 12-08. The stated return procedure provides that "[t]he claimant generally produces the pink copy of the voucher." That instruction is obsolete because invoice forms no longer include a pink copy. The next instruction, "[i]f the claimant is listed as the owner on the Property Clerk's copy, the property is returned immediately," is misleading, as in practice, the claimant first must endeavor to learn the location of the property and travel to retrieve it and will need to show photo identification as well.

54. Investigatory property was added to the rules later, created post *McClendon* litigation by the NYPD. Copy and pasted from the NYPD Patrol Guide, 38 RCNY § 12-06 states that "[p]roperty vouchered for investigation will require the claimant to obtain a release from the investigating officer, in writing, usually on department letterhead. (Police Department Patrol Guide, procedure 113-22.)." However, this cited Patrol Guide procedure has since been deleted. This described process no longer exists and arguably never existed.

55. The only other reference in the Rules to the investigatory category states that the Rules do not apply to the investigatory category: "Investigatory property unconnected to an arrest

(as distinguished from property seized at the time of an arrest or property seized in a case in which an arrest is later made) is not within the scope of this subchapter." 38 RCNY § 12-38.

56. The NYPD has created other property seizure categories outside the scope of the City Rules as well. *See* Patrol Guide Procedure 218-0. The City Rules contain no prohibition against this, nor do they mandate general return of any property seized by the NYPD. Thus, property categories that exist outside the City Rules are not subject to any of the return procedures within them.

57. The NYPD creates and employs these additional property seizure categories without prior notice, a clear definition, or publicly-available procedures governing the return of that type of property.

58. For these NYPD-created property seizure categories, including property seized as investigatory and "determine true owner" ("DTO") among others, the City Rules provide no procedures for the return of such property and no due-process protections governing property seized under these categories.

### A. *The City Rules Unlawfully Place the Burden on Claimants and Do Not Require the City to Provide Notice in the Form of Instructions for Retrieval.*

59. The City Rules continue to put the full burden on the claimant to successfully retrieve their property.

60. Under 38 RCNY § 12-35(b), the NYPD Property Clerk is required to return non-contraband arrest evidence only "upon timely demand" by the claimant, who must produce identification, their original invoice, and a District Attorney's release ("DA Release"). This process applies even after acquittal or dismissal of criminal charges. The City Rules contain no requirement that the NYPD initiate return or provide affirmative notice that property may be retrieved, in violation of due process.

61. The City Rules do not require that claimants be told where their property is being held. Claimants are left to guess—and then travel, often across boroughs—with no formal mechanism to locate their property, also in violation of due process.

62. Crucially, neither the City Rules nor the Administrative Code require that property invoices include instructions for reclaiming one's property.

63. 38 RCNY § 12-32(e) requires that invoices describe certain procedures in bold lettering, but that mandated language focuses more on the burdens placed on the claimant and timelines for property disposal than on instructions for how to retrieve property or where property is located.

64. For example, the only procedure that attempts to address the return of property, § 12-32(e)(ii), states: "In order to obtain the return of the property, the claimant or a representative authorized by a notarized writing to claim the property will be required to submit, in person or by mail, the voucher and proper identification to the office of the police property clerk located at a central location in each borough. The property may be disposed of by the police property clerk according to law unless the claimant demands the property no later than 120 days after the termination of criminal proceedings." The few words in this provision not burdening the claimant or focusing on destruction timelines barely skim the surface of the instructions required for a person to successfully obtain the return of their property.

65. The City Rules inexplicably require that the claimant (and not their counsel) request a DA Release. 38 RCNY § 12-34(a). This places the burden on claimants who are defendants in a criminal case to communicate directly with the District Attorney's Office that is prosecuting the related criminal case, without their counsel, to secure the return of their property.

66. The City Rules also permit the District Attorney's Office to deny release of property indefinitely, even after a criminal prosecution has concluded, with no opportunity to be heard at any point. *See* 38 RCNY § 12-34(d)–(f). The only avenue to challenge a refusal is to request review by a supervisor internal to the District Attorney's Office—meaning claimants are not afforded review by any neutral arbiter.

67. The City Rules do not require that a claimant be afforded an opportunity to be heard on challenges related to seizure, ownership, classification, or length of retention.

68. The City Rules do not provide a procedure through which claimants can correct errors or typos on invoices generated by the NYPD, which prevents people from retrieving their property.

69. The City Rules do not include an enforcement mechanism to ensure the NYPD and District Attorneys' Offices follow the proper regulatory procedures. No incentive exists for the NYPD to return property before the deadline to dispose of the property. When the NYPD or the District Attorneys' Offices refuse to return property in violation of the City Rules, the claimant's only recourse is to sue.

### B. *The Rules Are Complex, Outdated, and Inconsistent and Deprive Claimants of a Meaningful Opportunity to Retrieve Their Property.*

70. The City Rules further burden claimants because they are complex, outdated, and internally inconsistent, making it difficult for claimants to understand what procedures and deadlines apply and what steps they must take to recover their property. To make matters worse, the NYPD then routinely disregards portions of the City Rules altogether, rendering any purported protections of the Rules illusory and leaving it virtually impossible for a claimant to know how to retrieve their property.

71. Chapter 12 spans more than 38 separate subparts, each layered with sub-sections, conditional scenarios, exceptions, and outdated provisions. Rather than providing a clear process, Chapter 12 forces claimants to determine which of several overlapping provisions govern the retrieval of their property—often after criminal proceedings have concluded and they no longer have an attorney.

72. The primary instruction for the return of property, which the Rules require be printed on the invoice, is not only inadequate, but now obsolete:

> In order to obtain the return of the property, the claimant or a representative authorized by a notarized writing to claim the property will be required to submit, in person or by mail, the voucher and proper identification to the office of the police property clerk located at a central location in each borough.

38 RCNY § 12-32(e)(ii).

73. Much of this instruction is no longer applicable and is inconsistent with the procedure that Property Clerks currently require claimants to follow. First, despite the mail option referenced in the Rules and on the invoice, in practice, the NYPD has declared that it will not accept communication through mail. Second, there is no longer "a central location in each borough"; rather, there are several NYPD Property Clerk locations in each borough—in addition to automobile pounds and precincts. Third, there is no formal method by which claimants can find out which of these locations hold their property.

74. Section 12-32(e)(iii) is another of the provisions required to be printed on the invoice, and states that claimants seeking the return of property "other than arrest evidence" do not require a DA Release. 38 RCNY § 12-32(e)(iii). This is, in practice, inaccurate. The NYPD Property Clerk requires a DA Release for the "forfeiture" category of seized property, and for the NYPD-created investigatory category, which also may require a DA Release and yet is not mentioned in this sub-section.

75. Another procedure the Rules mandate be printed on the invoice is also obsolete:

> A claimant demanding the return of arrest evidence from the property clerk should obtain prior to the demand either a district attorney's release or a supervising district attorney's statement refusing to grant a release, although presentation of either or both of these documents to the property clerk is not required for making a timely demand. If demand for the property is made without a district attorney's release, or a supervising district attorney's statement, the claimant shall have 270 days from such demand to obtain a district attorney's release or a supervising district attorney's statement refusing to grant a release. If a release or statement refusing to grant a release is not provided to the property clerk within such period, the property may be disposed of according to law.

38 RCNY § 12-32(e)(iv).

76. The NYPD Property Clerk offices currently refuse to accept any demand for property without a DA Release—making the 270-day grace period a legal fiction that persists on the back of every invoice.

77. The Rules also conflict with one another. For example, one section states that title is required as proof of ownership for the return of vehicles (§ 12-15), and yet another states that "title (or a reasonable explanation for its absence) *may* be required" (§ 12-35(f)) (emphasis added).

78. Thus, the fact that the City Rules conflicting with § 14-140 and are also internally inconsistent and inaccurate, which eliminates the possibility of constructive notice and undermines any due process protections the Rules were intended to provide.

## III. The City Agencies Involved in Property Seizure Maintain Their Own Arbitrary Practices, Contributing to Egregious Procedural Inconsistencies That Deprive People of Their Property.

79. The agencies charged with enforcing the City Rules rely heavily on internal and arbitrary practices that can vary from office to office and person to person with no oversight and no recourse for the claimant. These practices lack transparency and are being used to deprive people of their property.

### A. *The NYPD and District Attorneys' Offices Maintain Their Own Inconsistent and Unregulated Internal Practices.*

80. Under the City Rules and the NYPD's Patrol Guide, once the NYPD seizes property, the process for retrieval depends on both the type of property seized and on an internally assigned property category, *see supra* ¶¶ 47–58. The classification decision is made unilaterally by the arresting officer at the time the property is invoiced.

81. Many of the processes and property categories exist only within NYPD's Patrol Guide, if anywhere. Thus, they may be modified at any time without public notice, legislative action, or independent oversight. The NYPD can continue to create new property seizure categories at will for as long as property seizure and return practices are not comprehensively regulated.

82. For example, upon information and belief, the "investigatory" category was first created by the NYPD after the *McClendon* litigation began. There is currently no process in effect outside of filing an Article 78 proceeding through which owners of investigatory category property may seek its return, in direct violation of *McClendon*. 460 F.2d at 116.

83. The NYPD created this property category loophole outside of any applicable rules and regulations, and nothing in the current regulatory framework prevents the NYPD from continuing this pattern.

84. In practice, the NYPD labels property as "investigatory" whenever an officer determines that an item might be connected to an ongoing investigation—even where no warrant has issued and no charges are ever brought. The category has been applied to virtually every type of property: cash, cell phones, vehicles, and personal effects alike. Once labeled investigatory, property is effectively beyond reach because the NYPD Property Clerk's return procedures under the City Rules do not apply. A DA Release and even the dismissal of criminal proceedings will

not secure the release of the property. The property sits in limbo, indefinitely, with no process by which an owner can demand its return.

85. The Determine True Owner ("DTO") category is similarly unregulated resulting in rampant loss of property. Created by the NYPD at an unknown time, it appears nowhere in the City Rules or Administrative Code. As there is no written definition, it can be modified or expanded by the NYPD at any time, without public notice. It has historically been applied to vehicles whose titled owner the NYPD claims it cannot immediately identify—with the consequence that a vehicle classified as DTO may be destroyed or auctioned a mere 14 days after seizure, without any notice to the person from whom it was seized.

86. There are no regulations that prevent the NYPD from creating additional property categories with their own return procedures, or without return procedures at all.

87. Similarly, each county District Attorneys' Offices have unique internal rules and procedures for issuing or refusing to issue DA Releases. For example, Queens and New York Counties have standardized forms created for the DA Release process, whereas Kings County has no such form, and therefore each Assistant District Attorney in Kings County has their own arbitrary method for receiving or responding to, or refusing to respond to, requests for DA releases. Similarly, Kings County District Attorneys seem unaware of the time limits in the City Rules, while in Queens, the time limits appear in the form. Additionally, the Kings and New York County District Attorneys will refuse to provide the release to defense attorneys and instead require the defendant they are prosecuting to interact with their office directly to obtain one. Queens and Bronx Counties will provide the DA release directly to counsel.

88. Similarly to the NYPD internal categories, the internal rules for DA Releases also change often with no notice to claimants or their counsel and no oversight, further frustrating the return process.

89. Because the formal system of property seizure and return is so opaque, it permits the NYPD and the District Attorneys' Offices to develop and rely on arbitrary and inconsistent practices to navigate it.

### B. *Invoice Content Determined by NYPD Omits Information and Procedures Required to Retrieve Seized Property.*

90. The property invoices the NYPD does issue are legally deficient. NYPD Property Clerk invoices contain the minimal language required by the City Rules. They also contain or exclude other content that, upon information and belief, the NYPD internally and unilaterally decided to include.

91. Upon information and belief, the NYPD uses a software called the Property and Evidence Tracking System ("PETS") (also referred to as FORMS – Property) to track seized property and evidence. Invoicing officers input information into fields and then the software creates at least three different copies of invoices depending on its intended recipient. This includes the "Property Clerk Copy," the "ADA Copy," and the "Prisoner/Finder/Owner Copy." None of these fields include instructions for return.

92. The Prisoner/Finder/Owner copy of the invoice does not contain the owner's name because the NYPD internally decided to omit it. As a result, if the owner's name is misspelled or wrongly assigned in the system, a frequent error, claimants have no way to identify or challenge the error. The Property Clerk may have difficulty finding their invoice or their property, or even if found, may refuse to return it to the rightful owner because the name is written or spelled differently, or a name is omitted entirely. There is no procedure to fix this error.

93. The invoice omits these critical details and instead focuses primarily on when the property will be disposed, based only on property categories that may be unknown to the claimant. There is language on the invoice that alerts the claimant that NYPD "can change the Invoice Category without further notice," and they often do, meaning that the procedure for return or disposal can change at any time without further notice to the claimant.

94. The DTO category, which authorizes disposal of vehicles within 14 days, is outside the scope of the City Rules. Accordingly, claimants whose vehicles have been classified as DTO do not receive any information regarding how to challenge that classification or how to obtain release of their vehicles before they are auctioned or destroyed.

95. For property marked "investigatory," the invoice states only: "Investigatory property is disposed of after one year, unless otherwise requested by the investigating officer." It provides no return mechanism, no point of contact, and no process to challenge retention.

96. Taken together, the unconstitutional Administrative Code provision that has been on the books for over fifty years, the contradictory regulatory scheme that purported to replace it, and the NYPD's own property categories created and governed outside the regulatory structure leave New Yorkers without a coherent framework to recover their property. But the systemic defects described above do not fully capture the harm caused. Beyond these regulatory failures, the NYPD routinely ignores even the minimal procedural safeguards that do exist.

## IV. The Regulatory Pitfalls Are Compounded by the NYPD's Routine Noncompliance with Property Return Procedures.

97. Setting aside the lack of due process inherent to the New York City property scheme, whatever safeguards exist in the City Rules are effectively nullified by the NYPD's routine noncompliance. Officers regularly refuse to issue invoices, eliminating the possibility that

the notice requirement of due process is satisfied. And the NYPD uniformly refuses to correct errors on invoices that are issued, compounding the harm by blocking the path to retrieval entirely.

### A. *NYPD Consistently Fails to Issue Required Property Invoices.*

98. A central obstacle to reclaiming seized property is the NYPD's pervasive failure to issue invoices. The invoice functions as both a receipt and the claimant's essential document for initiating the retrieval process.

99. Despite the mandate in 38 RCNY § 12-32(d) requiring officers to inventory seized property and issue an invoice at the time of arrest, the NYPD consistently fails to provide invoices during arrest processing. People who are arrested are commonly told that no invoice is necessary or that the officer is not permitted to provide invoices.

100. When people later return to the precinct seeking their property or an invoice, they are often told that their property cannot be released, that it has been moved to an unknown location, or that the officer is not permitted to provide any information about the property.

101. In many cases, property is never invoiced and thus not logged into PETS. Items omitted from PETS are treated as lost.

102. This problem is especially acute for identity documents and general property. The NYPD commonly fails to invoice—and therefore loses—driver licenses, social security cards, green cards, and other vital forms of identification. These identification documents can be cumbersome to replace, particularly when multiple forms of identification are lost together. Similarly, vehicle keys are also regularly lost due to an informal NYPD practice of taping keys to the NYPD copy of a seized vehicle's invoice instead of invoicing them separately.

103. Without an invoice, a claimant receives no written notice of what property the NYPD holds. The absence of this basic documentation transforms an already opaque and burdensome retrieval process into one that is nearly impossible to navigate.

**B. *The NYPD's Blanket Refusal to Correct Invoice Errors Effectively Denies Property Return.***

104. As discussed *supra*, invoices are created by the invoicing officer and frequently contain errors, such as misspelling owners' names, invoicing property to the wrong person, misusing a property category, or forgetting to invoice something entirely.

105. These simple errors make property retrieval impossible if they are not corrected. If the invoicing officer invoices property to the wrong owner, spells the person's name wrong, uses a nickname, or the name on the invoice is different in any way than the name on the claimant's identification, the Property Clerk will not return it. If an officer mistakenly invoices property as investigatory but writes in the invoice notes that it is no longer needed or that category was chosen by mistake, it makes no difference; the Property Clerk will refuse to return until the category is corrected. Unfortunately, invoicing officers almost universally refuse to correct invoices.

106. The City Rules provide that a claimant may "examine the voucher" and note disagreement with the listing of items seized. In practice, officers do not offer people an opportunity to inspect their invoices, nor do officers advise them of their right to object and have their objections recorded.

107. The only way for claimants, or anyone else, to correct these errors is to request that the invoicing officer void the mistaken invoice and issue another. Only the invoicing officer can correct the mistake, and because officers routinely refuse to make changes, or work in a specialized unit where they are, by design, impossible to reach, there is no functional system for correcting these mistakes.

108. In practice, these errors are virtually impossible to correct short of filing affirmative litigation against the NYPD Property Clerk—a remedy that is wholly inaccessible to most

claimants and perpetuates the very constitutional violations that *McClendon* sought to end more than fifty years ago.

## V. The Existing Property Retrieval Labyrinth Causes Widespread Loss of Property and Systemic Constitutional Harm.

109. The NYPD's own annual Seized Property Data Reports confirm that a substantial portion of property seized from New Yorkers is never returned—not due to lawful forfeiture, but due to systemic obstacles, lack of notice, and procedural dead ends that prevent rightful owners from recovering their belongings.

110. Over 71% of currency invoiced as arrest evidence was not returned in 2025, and over 74% was not returned in 2024. *See* Local Law 131, Administrative Code section 14-169[5] – Seized Property Data Report.

**Arrest Evidence Currency Returned by Borough 2025**

| Command | Number of Vouchers | Vouchered Value ($) | Returned to Claimant ($) |
|---|---|---|---|
| Bronx | 1,495 | $253,618.29 | $90,589.99 |
| Brooklyn | 680 | $135,127.34 | $29,029.24 |
| Manhattan | 1,939 | $592,808.94 | $193,711.13 |
| Queens | 453 | $101,544.38 | $2,677.00 |
| Staten Island | 76 | $32,308.96 | $452.00 |
| **Total** | **4,643** | **$1,115,407.91** | **$316,459.36** |

Figure 3: N.Y.C. Police Dep't, *Seized Property Data Report 2025*, Attachment A, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

**Arrest Evidence Currency Returned by Borough 2024**

| Command | Number of Vouchers | Vouchered Value ($) | Returned to Claimant ($) |
|---|---|---|---|
| Bronx | 1,449 | $256,431.22 | $96,901.70 |
| Brooklyn | 865 | $167,957.54 | $37,573.18 |
| Manhattan | 1,927 | $506,530.61 | $142,598.04 |
| Queens | 447 | $132,350.66 | $1,982.94 |
| Staten Island | 67 | $71,671.17 | $12,680.49 |
| **Total** | **4,755** | **$1,134,941.20** | **$291,736.35** |

[5] Local Law 131, Administrative Code section 14-169 requires the NYPD to post on the department's website an annual report providing data on seized property and retained property for the preceding calendar year.

Figure 4: N.Y.C. Police Dep't, *Seized Property Data Report 2024*, Attachment A, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

111. Similarly, 69% of currency invoiced as forfeiture in 2025 was never returned, and 81% seized for forfeiture in 2024 was never returned. None of the currency in either year was retained after a judgment in a civil forfeiture proceeding. *Id.*

**Forfeiture Currency Returned by Borough 2025**

| Command | Number of Vouchers | Vouchered Value ($) | Returned to Claimant ($) |
|---|---|---|---|
| Bronx | 835 | $1,391,318.37 | $522,750.25 |
| Brooklyn | 1,023 | $2,674,953.02 | $632,577.62 |
| Manhattan | 990 | $1,186,265.06 | $424,946.62 |
| Queens | 601 | $3,203,176.67 | $1,040,719.27 |
| Staten Island | 167 | $325,105.88 | $104,197.72 |
| **Total** | **3,616** | **$8,780,819.00** | **$2,725,191.48** |

Figure 5: N.Y.C. Police Dep't, *Seized Property Data Report 2025*, Attachment A, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

**Forfeiture Currency Returned by Borough 2024**

| Command | Number of Vouchers | Vouchered Value ($) | Returned to Claimant ($) |
|---|---|---|---|
| Bronx | 770 | $2,154,263.17 | $476,109.46 |
| Brooklyn | 974 | $2,980,657.97 | $848,192.02 |
| Manhattan | 673 | $2,171,270.85 | $180,702.58 |
| Queens | 751 | $2,534,842.60 | $370,830.16 |
| Staten Island | 168 | $216,814.30 | $12,503.52 |
| **Total** | **3,336** | **$10,057,848.89** | **$1,888,337.74** |

Figures 6: N.Y.C. Police Dep't, *Seized Property Data Report 2024*, Attachment A, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

112. If currency, regardless of the amount, is classified on the invoice as "investigatory," there is currently no process in effect by which to retrieve the currency. Thus, New Yorkers whose currency was seized and classified as "investigatory" fared by far the worst. A staggering 98% of such currency seized in 2025 was not returned, with exactly $0 returned in two out of five boroughs. Almost 94% of such currency in 2024 was never returned. *Id.*

**Investigatory Currency Returned by Borough 2025**

| Command | Number of Vouchers | Vouchered Value($) | Returned to Claimant($) |
|---|---|---|---|
| Bronx | 70 | $92,819.73 | $.00 |
| Brooklyn | 121 | $22,114.35 | $1,857.86 |
| Manhattan | 94 | $142,179.60 | $3,802.00 |
| Queens | 242 | $147,864.03 | $1,486.00 |
| Staten Island | 18 | $89,926.73 | $.00 |
| **Total** | **545** | **$494,904.44** | **$7,145.86** |

Figure 7: N.Y.C. Police Dep't, *Seized Property Data Report 2025*, Attachment A, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 212026).

**Investigatory Currency Returned by Borough 2024**

| Command | Number of Vouchers | Vouchered Value ($) | Returned to Claimant ($) |
|---|---|---|---|
| Bronx | 140 | $167,465.12 | $2,196.00 |
| Brooklyn | 138 | $164,197.20 | $.00 |
| Manhattan | 158 | $314,576.22 | $.00 |
| Queens | 263 | $233,687.93 | $55,162.33 |
| Staten Island | 14 | $14,091.33 | $.00 |
| **Total** | **713** | **$894,017.80** | **$57,358.33** |

Figure 8: N.Y.C. Police Dep't, *Seized Property Data Report 2024*, Attachment A, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

113. Of the vehicles categorized as "arrest evidence" seized in 2025, 56% have not been returned, 43% of vehicles categorized as "forfeiture" have not been returned (despite only twelve civil forfeiture judgments), and 83% of vehicles categorized as "investigatory" have not been returned. *See* Local Law 131, Administrative Code section 14-169 – Seized Property Data Report. Determine True Owner category statistics are not reported.

**Arrest Evidence Vehicle Invoices by Borough 2025**

| Borough | Motor Cycle | | Scooter/Moped | | Vehicle | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned |
| Bronx | 156 | 53 | 463 | 97 | 829 | 432 | 1,448 | 582 |
| Brooklyn | 78 | 15 | 135 | 22 | 502 | 234 | 715 | 271 |
| Manhattan | 38 | 14 | 276 | 138 | 756 | 434 | 1,070 | 586 |
| Queens | 74 | 17 | 132 | 14 | 408 | 184 | 614 | 215 |
| Staten Island | 14 | 6 | 8 | 0 | 170 | 104 | 192 | 110 |
| **Total Arrest Evidence** | 360 | 105 | 1,014 | 271 | 2,665 | 1,388 | 4,039 | 1,764 |

Figure 9: N.Y.C. Police Dep't, *Seized Property Data Report 2025*, Attachment B, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

**Forfeiture Evidence Vehicle Invoices by Borough 2025**

| Borough | Motor Cycle | | Scooter/Moped | | Vehicle | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned |
| Bronx | 10 | 6 | 9 | 2 | 277 | 181 | 296 | 189 |
| Brooklyn | 18 | 6 | 25 | 3 | 333 | 163 | 376 | 172 |
| Manhattan | 4 | 3 | 1 | 0 | 203 | 134 | 208 | 137 |
| Queens | 4 | 1 | 3 | 1 | 219 | 126 | 226 | 128 |
| Staten Island | 1 | 1 | 0 | 0 | 30 | 20 | 31 | 21 |
| **Total Arrest Evidence** | 37 | 17 | 38 | 6 | 1,062 | 624 | 1,137 | 647 |

Figure 10: N.Y.C. Police Dep't, *Seized Property Data Report 2025*, Attachment B, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

**Investigatory Evidence Vehicle Invoices by Borough 2025**

| Borough | Motor Cycle | | Scooter/Moped | | Vehicle | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned |
| Bronx | 4 | 1 | 18 | 1 | 265 | 31 | 287 | 33 |
| Brooklyn | 11 | 1 | 25 | 1 | 199 | 30 | 235 | 32 |
| Manhattan | 1 | 1 | 10 | 0 | 84 | 25 | 95 | 26 |
| Queens | 10 | 0 | 19 | 4 | 167 | 34 | 196 | 38 |
| Staten Island | 1 | 0 | 0 | 0 | 19 | 8 | 20 | 8 |
| **Total Arrest Evidence** | 27 | 3 | 72 | 6 | 734 | 128 | 833 | 137 |

Figure 11: N.Y.C. Police Dep't, *Seized Property Data Report 2025*, Attachment B, titled as "Inventory Evidence," https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

114. The numbers are similar for 2024, with almost 60% of vehicles categorized as "arrest evidence" seized in 2024 not returned, over 48% of vehicles categorized as "forfeiture" not returned (despite only five civil forfeiture judgments), and over 80% of vehicles categorized as "investigatory" seized in 2024 not returned. *See* Local Law 131, Administrative Code section 14-169 – Seized Property Data Report. Determine True Owner category statistics are not reported.

**Arrest Evidence Vehicle Invoices by Borough 2024**

| Borough | Motor Cycle | | Scooter/Moped | | Vehicle | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned |
| Bronx | 235 | 66 | 622 | 109 | 847 | 418 | 1,704 | 593 |
| Brooklyn | 87 | 23 | 205 | 12 | 629 | 259 | 921 | 294 |
| Manhattan | 104 | 39 | 568 | 243 | 871 | 511 | 1,543 | 793 |
| Queens | 94 | 28 | 201 | 25 | 496 | 248 | 790 | 301 |
| Staten Island | 25 | 11 | 26 | 1 | 208 | 109 | 259 | 121 |
| **Total Arrest Evidence** | 545 | 167 | 1,622 | 390 | 3,050 | 1,545 | 5,217 | 2,102 |

Figure 12: N.Y.C. Police Dep't, *Seized Property Data Report 2024*, Attachment B, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

**Forfeiture Evidence Vehicle Invoices by Borough 2024**

| Borough | Motor Cycle | | Scooter/Moped | | Vehicle | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned |
| Bronx | 19 | 5 | 19 | 0 | 304 | 195 | 342 | 200 |
| Brooklyn | 24 | 2 | 31 | 1 | 385 | 173 | 440 | 176 |
| Manhattan | 3 | 1 | 8 | 3 | 201 | 131 | 212 | 135 |
| Queens | 14 | 10 | 9 | 1 | 269 | 134 | 292 | 145 |
| Staten Island | 1 | 1 | 1 | 0 | 37 | 26 | 39 | 27 |
| **Total Arrest Evidence** | 61 | 19 | 68 | 5 | 1,196 | 659 | 1,325 | 683 |

Figure 13: N.Y.C. Police Dep't, *Seized Property Data Report 2024*, Attachment B, https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

**Investigatory Evidence Vehicle Invoices by Borough 2024**

| Borough | Motor Cycle | | Scooter/Moped | | Vehicle | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned | Vouchered | Returned |
| Bronx | 14 | 1 | 22 | 2 | 201 | 42 | 237 | 45 |
| Brooklyn | 12 | 0 | 27 | 2 | 262 | 38 | 301 | 40 |
| Manhattan | 7 | 1 | 15 | 0 | 101 | 32 | 123 | 33 |
| Queens | 11 | 0 | 16 | 0 | 178 | 47 | 205 | 47 |
| Staten Island | 4 | 0 | 2 | 0 | 15 | 6 | 21 | 6 |
| **Total Arrest Evidence** | 48 | 2 | 82 | 4 | 757 | 165 | 887 | 171 |

Figure 14: N.Y.C. Police Dep't, *Seized Property Data Report 2024,* Attachment B, titled as "Inventory Evidence," https://www.nyc.gov/site/nypd/stats/reports-analysis/seized-property.page (last visited Oct. 21, 2026).

115. This data shows that the overlapping and conflicting statutes and rules, the lack of legally adequate procedures, and the NYPD's pervasive noncompliance with basic constitutional requirements have created a property retrieval system so disjointed that it is extremely difficult to know the process that must be followed in each case. To reclaim property, New Yorkers must navigate a maze of inconsistent rules—at least five different procedural combinations for vehicles, four for currency (with two separate paths depending on the amount of the currency seized), and at least three distinct processes for other types of general property returned—all while contending with as many as seven potential retrieval locations per borough.

**A. *Retrieval Process: Currency***

116. The process for retrieving seized currency depends not only on the amount taken but also on the property category chosen by the NYPD officer. Each category imposes different, and often contradictory, requirements.

117. For currency held as arrest evidence or potential forfeiture, the claimant must first obtain authorization for release from the assigned District Attorney on their criminal case.

118. The claimant must then go to the NYPD Property Clerk before 2:30 p.m. in their borough of arrest. If the amount seized is more than $1,000, or was invoiced for forfeiture, the claimant must submit a demand for their currency. The demand form is not required for amounts less than $1,000 not invoiced for forfeiture.

119. The demand form is then sent to the NYPD Legal Bureau, which checks for child support orders pending against the claimant pursuant to a Memorandum of Understanding between the NYPD and the Office of Child Support Enforcement ("OCSE"). This agreement is not part of the City Rules and does not appear in any published rules governing the NYPD property seizure process. Further, there is no indication or warning that this policy exists during any part of the property seizure or retrieval process. People often wait months while the NYPD consults OCSE without ever being notified of the reason for the delay in releasing their currency.

120. The claimant then must wait for a letter in the mail stating they may pick up a check for their currency at the NYPD Property Clerk 30 days *after* they have already waited to receive the letter.

121. In total, claimants often wait at least two to three months to successfully retrieve their currency, in violation of 38 RCNY § 12-36, which imposes a 25-day limit to file a forfeiture proceeding or notify the claimant that their currency will be returned to them.

122. These delays, especially when they violate the Rules and are unexpected, can have devasting financial impacts: New Yorkers have lost the ability to move out of shelters into apartments, they have been evicted because they had their expected rent payment seized, and work and business opportunities have been lost. Often it is a claimant's disability payment, their only income for the entire month, that is seized and not returned for months to come.

123. Only if currency is invoiced for safekeeping does the claimant receive a check for the seized funds upon arrival at the appropriate Property Clerk with photo identification—provided they arrive before 2:00 p.m. Although Property Clerk locations are open until 2:30 p.m., the clerk will not issue checks after 2:00 p.m.—an arbitrary restriction that further complicates the retrieval process.

124. The various formal and informal requirements for currency retrieval are not only enforced without notice but are also applied haphazardly across boroughs and even within the same NYPD Property Clerk office. The inconsistency and lack of due process is particularly challenging for people navigating the retrieval process without counsel.

**B. *Retrieval Process: General Property***

125. The process for retrieving personal property such as clothing, cell phones, personal documents and other belongings is similarly fragmented, inconsistent, and difficult to navigate. The NYPD's return procedures governing such property are often informal and can vary depending on the type, size, and location of the property, and many procedures that do exist are routinely misapplied.

126. The general property seized by the NYPD varies from items with tremendous emotional significance, like deceased family members' ashes and wedding rings, to irreplaceable legal documents like birth certificates from other counties and crucial immigration paperwork. General property, whose sentimental value often far outweighs its material cost, can be extremely difficult to retrieve and is often lost, compounding the harm suffered by claimants.

127. When general property is invoiced as arrest evidence, the claimant must first secure authorization for release from the District Attorney assigned to the criminal case. The claimant must then appear at an NYPD Property Clerk location with the DA Release and photo identification to retrieve the property.

128. In practice, this is rarely straightforward for several reasons. First, in violation of 38 RCNY § 12-34, the DA Release process is often opaque and varies by borough. In some boroughs, the DA will provide hard copy releases, but only to defendants and not their attorneys; in other boroughs, the DA will provide copies to attorneys; and in yet other boroughs, DA Property Clerks, employed by the DA's Office, insist on communicating directly with defendants at the moment that they are picking up the property and then the DA Release will be emailed to the property retrieval location at that time.

129. Because of this inconsistency, some NYPD Property Clerks and precincts will accept only a hard copy of the DA Release while others will accept only a direct phone call or other times only an email from the District Attorney's Office. If the few employees of the District Attorneys' Offices that email DA Releases are out to lunch, sick, or their computers are down, they will not answer the phone, and the claimant will not be able to retrieve their property.

130. Once a DA Release is secured, it is then very difficult for a claimant to know where to pick up their property because there are multiple location options. For example, the property may be at any of the borough DAs' Offices, at any of the seven borough NYPD Property Clerk offices and warehouses, or at any of the multiple precincts in any borough. At no point is the claimant provided with notice about the location of their property, as property location is not listed on the invoice and property may be moved from location to location with no notice to the owner.

131. When general property is located at the District Attorney's office, there is no method by which a claimant can retrieve their property directly from the DA's Office. Instead, they must wait for the invoicing officer to deliver it back to a NYPD Property Clerk location for retrieval. This can take weeks or several months.

132. Generally, claimants do not have legal counsel to assist them in this retrieval process, leaving them forced to contact their arresting officers and prosecutors on their own.

133. Requiring defendants to communicate directly with the NYPD or DAs inherently endangers them. Without the assistance of counsel, defendants risk sharing information that might jeopardize their criminal cases. It also provides DAs and the NYPD with an opportunity to elicit testimony from defendants who are simply trying to obtain their own possessions to which DAs and the NYPD are no longer entitled.

134. Property is routinely destroyed or sold by the NYPD while claimants attempt to make their way through this process or have given up entirely because of the lack of notice and degree of difficulty.

135. If the general property is classified on the invoice as "investigatory," there is currently no codified process, nor any process currently in effect, by which to retrieve said property.

**C. *Retrieval Process: Vehicles***

136. A vehicle may be invoiced as "forfeiture," "arrest evidence," "safekeeping," "investigatory," "Determine True Owner (DTO)," or "Rotation Tow," among other possibilities. Each category carries a different return procedure, yet none of these procedures is listed on the vehicle invoice.

137. Upon information and belief, because the NYPD Auto Pounds have run out of space, officers have begun calling private tow companies to tow some vehicles after arrest and using the "Rotation Tow" or "Row Tow" property seizure category. When categorized as Row Tow, a vehicle may be sent to any tow yard or auto shop in contract with the NYPD and often no record is made of where it was sent. Claimants must pay exorbitant fees for storage while they attempt to locate their vehicles.

138. In yet another circumstance, an NYPD officer will sometimes not invoice a vehicle at all and instead park it near the scene of arrest. If a claimant returns to the precinct to inquire about their property and is fortunate enough to encounter that officer, they are often told to walk around the scene of their arrest to see if they can find their vehicle. Otherwise, this informal procedure or new location of the vehicle is not recorded anywhere.

139. As discussed *supra*, for the "Determine True Owner" category, there is no legal basis in any enacted rule or regulation, no statute or City Rule defines it, no instruction is provided to claimants, and no public facing NYPD document acknowledges its existence. DTO authorizes the destruction or auction of a vehicle within 14 days if the vehicle is not claimed, yet no notice is issued informing the claimant that the clock has started on permanent property loss, and invoices for DTO vehicles are frequently withheld entirely.

140. Vehicles may be stored at one of many locations: the arresting precinct, NYPD Auto Pounds—Springfield Gardens Auto Pound and Erie Basin Auto Pound—Insurance Auto Auctions, or any number of tow yards and auto shops in contract with the NYPD. There is no reliable means by which a claimant can learn which of these locations is storing their vehicle.

141. If the vehicle is located at the Springfield Gardens Auto Pound, a claimant may receive a letter informing them of the location of their vehicle, but only if they are the titled owner. The first instruction on that letter is to call the auto pound. However, Springfield Gardens Auto Pound rarely answers the phone and refuses to provide any other contact information, even to attorneys for claimants.

If your vehicle is being held for forfeiture pursuant to Section 14-140 of the NYC Administrative Code, the vehicle is eligible to be sold at auction or otherwise disposed of pursuant to Title 38, Section 12-35 of the Rules of the City of New York. For further information about disposal of a vehicle subject to forfeiture, you may contact the NYPD's Civil Enforcement Unit at civilenforcement@nypd.org and/or (646) 610-4500.

**YOU MUST FIRST CONTACT THE SPRINGFIELD GARDENS AUTO POUND AT 174-20 North Boundary Road, Queens, NY 11430, (718) 553-9555, 9556**

*****If your item is a Motorcycle, Electric bike, Scooter, Electric Pedal bike or Part please contact Erie Basin Auto Pound, 700 Columbia Street, Brooklyn, NY, 11231, Phone: (718) 246-2031, 2033*****

Figure 15: Form letter from Property Clerk Div., N.Y.C. Police Dep't, sent to titled owners of vehicles seized

142. If the claimant receives this letter at all, it is supposed to inform the intended recipient of the property seizure category of the vehicle and what may be needed to obtain the return of the vehicle. However, the property seizure category is often wrong.

143. The letter also cites the Administrative Code § 14-140 that has been held unconstitutional, as well as a demand procedure that is no longer applicable, and continues to instruct calling telephone numbers that go unanswered.

*To protect your rights* to a vehicle subject to forfeiture, contact the Springfield Gardens Auto Pound, 174-20 North Boundary *Road, Queens, NY* 11430, *(718)* 553-9555, 9556 or Civil Enforcement Unit and make a **Formal Demand** within one hundred *twenty (120) days* from case termination.

Figure 16: Form letter from Property Clerk Div., N.Y.C. Police Dep't, sent to titled owners of vehicles seized

144. If the vehicle is located at Erie Basin Auto Pound, a claimant must make an appointment for vehicle retrieval. The claimant can only make this appointment by sending an email to one particular person, but there is no way to learn this procedure or the particular email address required without experienced counsel. The waiting period for an appointment is currently at least two weeks.

145. For most of 2024, Erie Basin Auto Pound implemented an informal policy where they would "block" emails from any email address with numbers in it. As they do not respond to

phone calls, walk-ins, or, at the time, emails from counsel attempting to make appointments on behalf of their clients, this meant that if a claimant had a number in their email address, their email would simply never receive a response, and they would never be able to make an appointment to retrieve their vehicle.

146. For a significant portion of 2026, Erie Basin Auto Pound was attempting to charge claimants storage fees for vehicles that had a hold placed on them by either the NYPD or the District Attorneys' Offices.

147. The NYPD will send vehicles being prepared for auction to Insurance Auto Auctions ("IAA") in Medford, Long Island. There are no clear or public guidelines on when and why vehicles are sent there, how long they will be stored there before they are auctioned, and how and why fees are charged for transfer to and storage at IAA. This location is also extremely burdensome for claimants in New York City to travel to (especially without vehicles).

148. To receive an NYPD release to retrieve a vehicle from IAA, a claimant must contact Springfield Gardens Auto Pound. This is functionally impossible because, as previously stated, there is no reliable means by which to contact Springfield Gardens Auto Pound. Often claimants must travel to Springfield Gardens Auto Pound in person, near JFK Airport, to obtain information about their vehicle or a release, and then to Long Island to retrieve their vehicle.

149. Upon information and belief, no notice of transfer to IAA is sent to the person from whom the vehicle was seized, and no notice is provided before the vehicle is auctioned and any belongings from inside the vehicle destroyed.

150. People in New York often spend their life savings on a vehicle, either to maintain employment, pursue better job opportunities, share custody of a child who lives farther away, or accommodate a disability that makes walking and public transportation in New York City difficult.

Thus, navigating the bureaucratic process to retrieve their vehicles can be particularly problematic for those who depend on these vehicles, especially when they risk losing them entirely at an NYPD auction because they are unable to navigate the process within the NYPD's deadlines.

## VI. Plaintiffs and Putative Class Members Have Lost Property Seized by the NYPD Despite Attempting to Retrieve It and Suffered Harm as a Result of the City's Inaccessible Property Return System

### A. *Andrea Smith-Taylor*

151. On Christmas Eve 2024, Ms. Smith-Taylor went shopping for Christmas presents for her five young children and ended the day with two large bags full of gifts for them.

152. Before she could give her kids those gifts, officers from NYPD 30th precinct arrested her in New York County, New York on a charge that was later dismissed. All the gifts for her children and some of her own personal property were seized upon her arrest.

153. Subsequent to her arrest, her children stayed at an Administration for Children's Services ("ACS") facility. Ms. Smith-Taylor repeatedly asked what would happen to the gifts for her children when she was being arrested, and her arresting officer assured her that the gifts would follow the children to the ACS facility.

154. NYPD body-worn camera footage from the evening of Ms. Smith-Taylor's arrest clearly depicts one of the arresting officers, Officer Romell Fernandez, pointing to an area where a large silver bag (the size of a large trash bag) is visible and remarking to Sergeant Akieva Longmire, "we have no space in the car for the rest of her stuff, that's hers too," and then asking his sergeant to transport the items.

155. Ms. Smith-Taylor had two large bags containing a Play Station 4, a Play Station 5, a necklace and earring set, children's clothes and shoes, in addition to personal property for herself, including jewelry, and $3,500 in cash.

156. As Ms. Smith-Taylor begged the officers to ensure her children would receive their gifts, Officer Fernandez assured her that he would give them the gifts. Sergeant Longmire, who was asked to take the gifts, remarked that she would "be back for that" and then asked another officer, Officer Adrian Paz, to get the bags. Officer Paz then walked Ms. Smith-Taylor to the transport vehicle without the bags before walking back and turning off his body-worn camera.

157. As NYPD officers transported her to the precinct, Ms. Smith-Taylor begged the officers to make sure her children received their gifts. Officer Fernandez assured her he would deliver them. He did not. Neither, it turned out, did anyone else.

158. Ms. Smith-Taylor retrieved her children a few days after her arrest. The children had stayed at the Children's Center during that time.

159. When Ms. Smith-Taylor asked the Children's Center staff about the property, she was told that they had no knowledge of any gifts and that the children arrived with nothing but the clothes they were wearing.

160. Ms. Smith-Taylor's arresting and invoicing officer had invoiced the personal property that she was carrying on her person when she was arrested, including jewelry she was wearing, her purse—a waist bag, and the contents of her bag. Those items were returned to her the day after her arrest when she went to the precinct to pick up her belongings. But there were no invoices for the gifts or personal property inside the two large bags.

161. Ms. Smith-Taylor believed her other property was being held for the duration of her criminal case, and no one informed her otherwise. With no instructions on how to proceed, Ms. Smith-Taylor waited until her criminal case was dismissed to continue her search for her belongings.

162. When her criminal case was dismissed, she resumed her search. Based on the NYPD's assurance that ACS would take custody of her property, she began by asking ACS where her property was.

163. ACS told Ms. Smith-Taylor that they did not have any of her property or any knowledge of its whereabouts. ACS directed Ms. Smith-Taylor to speak with the NYPD. After being deprived of her property for about six months, this was the first instruction she received about how to go about getting it back.

164. Ms. Smith-Taylor then reached out to both the arresting officer and the 30th precinct. NYPD officers informed her they had no knowledge of her property's whereabouts.

165. Ms. Smith-Taylor's criminal defense team then began attempting to find her possessions. A member of her criminal defense team called Officer Randy Almonte at the 30th precinct in May 2025. Over the phone, Officer Almonte relayed that the arresting and invoicing officer, Officer Karl Yelenic, donated Ms. Smith-Taylor's property to ACS "out of the Christmas spirit."

166. Ms. Smith-Taylor's family court defense team then began contacting ACS and the Children's Center in search of the property. Multiple ACS employees confirmed they had no record of such gifts.

167. Ms. Smith-Taylor's counsel also spoke to an intake worker at the Children's Center who confirmed that an extensive inventory is done when children arrive and that her children arrived without any belongings.

168. The missing property was raised on the record in a family court case, where an attorney for ACS again confirmed that ACS had no knowledge of any gifts.

169. After months of searching, Ms. Smith-Taylor ultimately told her children that the gifts were gone. This was devastating to both Ms. Smith-Taylor's children and herself. The gifts were the product of Ms. Smith-Taylor's hard work and dedication to her children. Each of the gifts, and all that went in to procuring them, was taken from Ms. Smith-Taylor by the NYPD without any available recourse.

170. Ms. Smith-Taylor also sought answers regarding the gifts by making an Internal Affairs Bureau ("IAB") complaint. Thereafter, officers met with Ms. Smith-Taylor in a park and asked her about the gifts. Beyond this interaction, there was no follow up regarding the missing property. Ms. Smith-Taylor has yet to receive any of her children's gifts, her personal property, or her $3,500 back.

**B. *Tyquan Blount***

171. On May 20, 2024, Plaintiff Tyquan Blount was the victim of a shooting in Brooklyn, New York and subsequently transported to a hospital. During the transport, while Mr. Blount was unconscious in the ambulance, officers from the NYPD 88th precinct seized Mr. Blount's car keys, clothing (sweatpants, socks, a shirt, boxers), and a knee brace that he wore due to a knee injury. Officers also unlawfully removed Mr. Blount's earring from his ear and other jewelry from his body while he was unconscious. One piece of jewelry was a chain that held the ashes of Mr. Blount's son that passed away.

172. Mr. Blount was not under arrest, he did not give consent at any point, and the NYPD did not have a warrant for this seizure.

173. The NYPD invoiced the clothing and knee brace under the investigatory category. They never provided Mr. Blount with an invoice, nor did they even inform him that they had seized this property.

174. The NYPD invoiced the earring, chain with his son's ashes, and other jewelry under the "safekeeping" category but also never provided him with an invoice for that property, nor did the NYPD inform him that they had seized that property.

175. When he regained consciousness at the hospital, he asked medical staff about his property; however, they had no knowledge that the NYPD had seized his property prior to his arrival at the hospital.

176. Mr. Blount had no way of knowing that while he was unconscious and being transported to the hospital, NYPD officers took his property. While at the hospital, when he regained consciousness, the NYPD still did not provide him with invoices and did not tell him that they had seized his property.

177. Following his release from the hospital, he went to the precinct to inquire about his property. They sent him to Brooklyn Property Clerk. There, he was given some of his jewelry, sneakers, car keys, and invoices for other general property that he was told could not be returned to him. He was still not given invoices for his earrings and clothes.

178. They sent him to a third location, the Manhattan Property Clerk, to pick up his phone and clothing. He traveled there and was told that property could not be released.

179. He was told at the precinct that the District Attorney would have to approve the release of his other property, despite the earrings being categorized as safekeeping, and his clothing as investigatory. Neither of these property categories should require a DA release for retrieval.

180. Regardless, because Mr. Blount was not being prosecuted for any crime, he did not know which Assistant District Attorney to contact or how to request the release of his property.

181. Later, on June 12, 2024, Mr. Blount was arrested in Brooklyn, New York by officers from the NYPD 88th precinct for a reason unrelated to the earlier incident. His phone, on

his person at the time, was seized and invoiced under the investigatory category, despite being seized in connection with his arrest. Under the City Rules, evidence seized during an arrest must be categorized as arrest evidence. The invoice for the cellphone listed his name as both "prisoner" and "complainant."

182. Once Mr. Blount was arrested and assigned counsel, that counsel was able to request invoices for the property seized from him as a victim of a crime and discover that he was listed as the owner and complainant, but that his name had been misspelled. He would not have been able to find his property without counsel as he was a victim and not an arrestee, and therefore there was no arrest number to search by, and it could not be looked up by name.

183. After counsel tracked down the invoice for the earrings previously seized, as well as the location of his earrings, Mr. Blount was finally able to retrieve his earrings in September of 2025, over a year after they were seized.

184. Mr. Blount's attorney also made a demand to the NYPD Legal Bureau for the return of Mr. Blount's cell phone and clothing, invoiced as investigatory. Two months after the demand, the property category had to be changed to arrest evidence, so that there could be a procedure for its return, as there is currently no procedure for return for investigatory category property.

185. Only the invoicing officer can change the property category, so Mr. Blount had to wait two months for this invoicing officer to do so.

186. It was also then that counsel learned that Mr. Blount's clothing and cell phone were being held at two separate facilities.

187. Once the property category was changed from investigatory to arrest evidence, Mr. Blount then needed to obtain a DA Release to be able to retrieve his property.

188. Mr. Blount went to one of the facilities where his property was located to retrieve his belongings in September 2025. He called the DA's Office while there to request authorization for release, as is the current process in Kings County, but was told the computers were down and no releases could be provided.

189. Counsel for Mr. Blount then contacted the DA's Office for a Release only to learn the property would not be released because the case in which Mr. Blount is a complainant remained open.

190. Over two years post seizure and after multiple attempts by both Mr. Blount and his counsel to secure the return of his property, the NYPD has yet to return Mr. Blount's clothing, knee brace, or cell phone to him.

191. Additionally, on August 17, 2024, in Brooklyn, New York, Mr. Blount was driving in a car when he was pulled over and arrested, again by NYPD officers from the 88th precinct, for a vehicle and traffic related violation that was ultimately dismissed.

192. After the arrest, officers seized Mr. Blount's car and drove both his car and Mr. Blount back to the precinct. The Captain requested that they speak, and indicated that Mr. Blount would not get his car back if he refused. When Mr. Blount refused, the Captain instructed the arresting officer not to invoice the car.

193. When Mr. Blount attempted to go back to the precinct to retrieve the car after his arrest, he had the bill of sale and the title signed over to him from the previous owner inside the car. The arresting officer refused to accept the documents as proof of ownership and categorized the car as "Determine True Owner."

194. She also invoiced the ownership documents with the car, against NYPD policy, which requires separate invoices for many reasons, one of which is so that they may be returned

separately from the vehicle. Invoicing them together makes it impossible for Mr. Blount to register the signed over title to his own name or give him any chance of retrieving the vehicle before it would be auctioned off by NYPD. Essentially, this invoicing method ensured Mr. Blount would lose his vehicle.

195. Counsel for Mr. Blount emailed and called the arresting officer several times to ask her to invoice the documents separately, as required. The arresting officer said she did not believe that was the correct policy and would speak to her supervisors and follow up. The officer never did, despite many attempted follow-ups through phone and email for over a month, from September 3 to 25, 2024.

196. On September 25, 2024, Mr. Blount called the precinct again and they indicated his documents were there and ready for him to pick up, but they had sent his car to Atlantic Auto Spa in Dyker Heights, Brooklyn. The relationship between Atlantic Auto Spa and the NYPD is unknown—it is not an official NYPD auto pound or tow lot.

197. The documents were still not separately invoiced. Further, Mr. Blount would not have known he was able to retrieve his documents or that his car had been moved had he not affirmatively contacted the precinct on September 25, 2024.

198. Mr. Blount’s car was ultimately transported three times, eventually ending up at Springfield Gardens Auto Pound in Jamaica, Queens, where it was being prepared to be sent for auction.

199. Mr. Blount was never affirmatively notified about any of these location changes, and the repeated transport damaged his vehicle. His flex pipe and muffler were damaged, among other damages to the bottom of his vehicle.

200. He had to obtain a new title and was finally able to pick up his car on November 1, 2024. He was forced to pay exorbitant storage fees plus transfer fees to retrieve his car due to the lengthy process he navigated to find and claim his vehicle.

**C. *Nygee Rogers-Green***

201. In the fall of 2025, Plaintiff Nygee Rogers-Green was living in a shelter and nearly all of his belongings were inside of his vehicle, including important documents, all of his books, backpacks, shoes, almost all of his clothing, some food, AirPods, a bank card, and more.

202. On October 11, 2025, officers from the NYPD 83rd precinct arrested Mr. Rogers-Green in Brooklyn, New York while he was inside his vehicle.

203. Following his arrest, officers seized his vehicle, drove it back to the 83rd precinct and parked it in the precinct parking lot.

204. Body-worn camera footage shows officers removing all of Mr. Rogers-Green's belongings from inside his vehicle—his clothing, books, shoes, and crates and bags full of his personal belongings from the backseat and trunk. Officers threw these items onto the ground outside the vehicle and later placed them into large, clear plastic bags.

205. None of the property removed from inside Mr. Rogers-Green's vehicle was invoiced by the NYPD.

206. Mr. Rogers-Green was released from arraignments on October 12, 2025, and returned to the precinct the same day to retrieve his property.

207. Mr. Rogers-Green was able to recover the property that the NYPD had seized from his person through standard procedures, as the NYPD had invoiced it as required.

208. However, when he asked precinct staff about his property taken from inside his vehicle, he was told that the precinct had no knowledge of any such property.

209. Outside the precinct, next to a dumpster, Mr. Rogers-Green discovered three large clear plastic bags containing many of the belongings that had been inside his vehicle. He was able to retrieve that property—left by the NYPD as trash—only because he arrived at the precinct in time before it was permanently discarded.

210. At least one full bag worth of Mr. Rogers-Green's belongings remains missing, including items that had been stored in the backseat and trunk of his vehicle. Missing items include a hat, books, backpacks, clothing, and sneakers, among many other personal belongings. These were essentially all the belongings that Mr. Rogers-Green owned at that time, as he was living in shelter and keeping everything he owned in his vehicle. Everything he owned was un-invoiced, placed near the trash, and subsequently discarded.

211. Mr. Rogers-Green has also been unable to retrieve his car. He purchased his car shortly before his arrest. Because of this, title had not yet been transferred. The NYPD therefore invoiced the vehicle as Determine True Owner, meaning it was not invoiced as property belonging to Mr. Rogers-Green.

212. Mr. Rogers-Green attempted to register title right away so he could retrieve his car but learned that the seller signed the back of the title in the wrong place. The DMV instructed him that the seller would have to order a new title and sign the back again before he could register title in his name. Mr. Rogers-Green did not know the seller and could no longer contact him to ask him to do that.

213. Mr. Rogers-Green has yet to be able to retrieve his car and will likely never be able to. At this point, even if the title issues could be fixed, the fees would be unaffordable for him. Ultimately, the criminal case against Mr. Rogers-Green was dismissed and sealed. Nonetheless, he suffered the permanent loss of his car and belongings.

**D. *Eric Lawson***

214. On October 22, 2023, Mr. Lawson was leaving a friend's house in Queens, New York, with his cell phone, wearing a Balenciaga hat, AirPods, and a white gold ring with diamonds that his friend gave to him before he passed away when officers from the 113th precinct pulled up in unmarked cars and arrested him.

215. A search warrant had been executed at Mr. Lawson's home a few days prior, while he was not home.

216. On October 22, 2023, Mr. Lawson was arrested based on the results of that search warrant, and the NYPD also charged him separately with Obstructing Governmental Administration ("OGA"). The separate OGA charge was dismissed almost immediately.

217. When officers brought Mr. Lawson back to the precinct, they seized all property from his person. His cell phone, ring, AirPods, and hat were seized pursuant to the OGA arrest, not pursuant to the charges stemming from the search warrant executed at his home. The property seized was invoiced under the OGA arrest.

218. Mr. Lawson was never provided with any invoices.

219. After his release from incarceration a couple weeks later, Mr. Lawson returned to the 113th precinct to inquire about his property. Officers told him they did not have his property or any information about it. They directed him to the 103rd precinct, the precinct that executed the search warrant on his house.

220. He went to the 103rd precinct and inquired about his property again. Officers at that precinct also told him they did not have his property or any information about it.

221. He went back to the 113th precinct again, where this time an officer gave him only an invoice for his phone case. He asked for the rest of his property, but the officer told him that was all they had.

222. Mr. Lawson repeated that more property was seized, including the cell phone that the case must have been removed from, so the officer requested help from a Sergeant to search for more property.

223. The Sergeant then told Mr. Lawson that none of his property could be returned because it was all “under investigation.” Mr. Lawson asked what his ring, AirPods, and hat could possibly have to do with any investigation. The Sergeant again confirmed that everything was being held for investigation except for his phone case that could be released.

224. The Sergeant further instructed Mr. Lawson that he would have to “take it up with the DA” to obtain the return of his property.

225. Mr. Lawson then asked the criminal defense attorney on the proceeding tied to the search warrant charges about his property. His attorney did not receive an invoice for any of his belongings in discovery because the property was seized and invoiced under the OGA arrest, not the search warrant arrest, and the OGA case had been dismissed. Neither Mr. Lawson nor his attorney had any information about this seized property or how to get it back.

226. The criminal prosecution resulting from the search warrant executed at Mr. Lawson’s home terminated last year, in October 2025. With all criminal proceedings concluded, his criminal defense attorney requested a District Attorney release for the property, but the Queens County District Attorney declined to authorize release because “No voucher was found.”

227. When counsel for Mr. Lawson then requested invoices from NYPD attorneys, invoices were in fact located and provided for the first time three years after seizure. An invoice was found for his ring, which had been categorized as “safekeeping.” The Property Clerk approved its disposition in June 2025. That approval inexplicably occurred two years after the seizure, but

one year before Mr. Lawson had ever seen an invoice or been told that his ring was available for retrieval.

228. An invoice was also located for Mr. Lawson's cell phone, which, despite having been seized at arrest, was categorized as "investigatory." Under this category, there is currently no procedure for Mr. Lawson to obtain its return, even though it had been held at the Queens Property Clerk location for three years and has not been used in any investigation.

229. On September 22, 2026, the NYPD Property Clerk confirmed that the phone was destroyed on September 9, 2026, under the justification that "we only have to hold investigatory category property for a year."

230. The Property Clerk also confirmed that the ring was sent to auction in July 2025. This was not marked on the invoice.

231. Mr. Lawson lost his phone with baby pictures of his children on it, and a sentimental and expensive ring.

232. No invoices were ever located for Mr. Lawson's AirPods or designer hat; that property is deemed lost or discarded without ever having been invoiced.

**E. *Isaiah Rashad***

233. On June 26, 2024, in Brooklyn, New York, Mr. Rashad had just finished packing a vehicle for a weekslong, cross-country road trip to Las Vegas. His belongings included laptop computers, a speaker, a comforter, car keys, camera tripods, a large amount of clothing and shoes, and $11,000 in cash.

234. While Mr. Rashad was seated in the parked vehicle, officers from the NYPD 75th precinct arrested him and seized the vehicle full of his belongings. The NYPD did not provide him with invoices for any of the over 200 items packed in the car. The vehicle was invoiced as forfeiture property.

235. The day after his arrest, Mr. Rashad had an authorized representative go to the precinct to attempt to retrieve his property from inside the vehicle.

236. The officers incorrectly informed Mr. Rashad's representative that they could not release the property because it was marked as arrest evidence, and that Mr. Rashad would have to wait until the end of his criminal case to claim his property. The NYPD did not provide any invoices.

237. In reality, the property from inside his vehicle was marked as safekeeping and waiting until the end of the case would mean his property would be discarded. Additionally, arrest evidence property does not require waiting until the end of a case; the prosecuting attorney can authorize release at any time during the criminal proceeding.

238. Mr. Rashad sent a different family member back to the precinct the following day to ask about the property again. This family member was again incorrectly informed that the property could not be released until the criminal case was over, and again the NYPD did not provide any invoices. At this point, Mr. Rashad believed this information must be accurate.

239. The owner of the vehicle whom Mr. Rashad had rented the car from made her own attempts to retrieve the vehicle from the precinct and was repeatedly informed it could not be released until the criminal case was over. She had to retain an attorney to assist her and was ultimately able to retrieve the vehicle in May 2025, almost a year after the NYPD seized the vehicle.

240. At no point during Mr. Rashad's arrest or the many months of multiple people inquiring about the property seized was Mr. Rashad given any invoices, nor was he informed that any invoices existed.

241. It was not until the Assistant District Attorney on Mr. Rashad's criminal case provided discovery in May 2025 that Mr. Rashad learned there was an invoice for his belongings inside the car. His belongings were in fact invoiced as safekeeping, and by then, the invoice reflected that all his belongings had been discarded months prior.

242. A total of 217 items, including 2 laptop computers, a speaker, a comforter, car keys, camera tripods, and a large amount of clothing and shoes were destroyed.

243. Following this revelation, Mr. Rashad went to the precinct to ask whether there was any property remaining that had not been destroyed. He was advised for the first time to go to the Brooklyn Property Clerk location at 11 Front Street, Brooklyn, New York. More than a year after his arrest, this was the first time Mr. Rashad was provided with any information on how to retrieve his property.

244. At 11 Front Street, the Brooklyn Property Clerk staff told him for the first time that his property was invoiced as safekeeping property. This was the first time Mr. Rashad was given any information about how his property was being tracked and stored by the NYPD. However, the Clerk also told him that he should not have been directed to the 11 Front Street Clerk because they do not hold safekeeping property. He was then directed to go to yet another storage location in Brooklyn, where they ultimately told him that none of his property remained; it had all been discarded.

245. Counsel for Mr. Rashad followed up with the NYPD Property Clerk to ensure that there was no remaining property in the NYPD's possession and learned that there was in fact more invoiced property in their possession, namely, money and cell phones. Both were invoiced June 26, 2024, yet the invoices were never provided despite repeated requests from Mr. Rashad. The invoices were provided on August 1, 2025, only after Mr. Rashad's counsel requested them.

246. Mr. Rashad was arrested with approximately $11,000 in cash that he intended to take on his vacation. However, the NYPD arresting officer only created an invoice for $330.76.

247. With the assistance of counsel, Mr. Rashad was ultimately able to retrieve the $330.76 cash that had been invoiced, and his cell phones, although they were smashed and destroyed upon retrieval, over a year after they were seized. His other 217 items and remaining currency were never returned.

**F. *Travay Best***

248. Plaintiff Travay Best was driving into New York City to visit a friend with his car packed with his backpack, clothing, a flash drive containing his resume, school documents, including a student ID and folders, and other personal items.

249. Mr. Best was arrested on May 13, 2025, by the NYPD 67th precinct. The NYPD seized his vehicle and invoiced it as arrest evidence but later reclassified the vehicle as forfeiture on May 14, 2025.

250. The NYPD did not provide Mr. Best with any invoices at the time of his arrest. After his arrest, he was released from arraignments but was subsequently hospitalized. When he was released from the hospital in June 2025, his mother took him to the precinct to retrieve his seized property.

251. At that time, officers at the 67th precinct returned some identification cards and provided him with some invoices from property seized from his body—including for his clothing, money, jewelry—and for his vehicle. Officers directed him to a property storage location in Queens to retrieve his property.

252. When Mr. Best went to that location, he was able to retrieve much of his property, including his jewelry and currency, but he remembered having more currency on him than the amount that was invoiced and returned.

253. That location did not have his clothing, and he had to travel to a second property storage location in Queens to retrieve his clothing.

254. At that point, Mr. Best continued to have no information about his property from inside of his vehicle. That property included important personal items, including a flash drive holding his professional resume and school documents. He repeatedly called the precinct, providing his arrest number and asking about the property taken from inside his vehicle.

255. Precinct staff repeatedly told him that he had already been given everything and stated that they had no additional invoices for him. When Mr. Best asked specifically about the belongings from inside his car, he was told that the items were probably still inside the vehicle.

256. Based on these representations, Mr. Best believed his belongings remained in the car. As his vehicle was invoiced for forfeiture, he believed he could not get his car back until his criminal case concluded.

257. On October 23, 2025, after his criminal case had concluded, Mr. Best contacted the NYPD Auto Pound to retrieve his vehicle. They told him that he could not retrieve the car and informed him that there was nothing inside the vehicle.

258. Mr. Best then contacted the precinct again on October 23, 2025, relayed what the Auto Pound had told him, and was informed by precinct staff that they had suddenly located an invoice for his belongings from inside the car. Unfortunately, he was told all of that property had been discarded.

259. He went to the precinct and was finally given an invoice, showing that his property had been discarded by the NYPD on September 23, 2025, and October 15, 2025.

260. The property that the NYPD discarded included his backpack, belt, sneakers, shoes, sunglasses, license plate, a flash drive containing his resume and school documents, hats, school

folders, keys, and other personal items. He was in school at the time attempting to obtain a cybersecurity certification. Losing his class notes and flash drive set him back in his class and in his certification.

261. In fact, some of the property, including his keys and student ID, had not yet been destroyed but officers at the precinct told him it was too late, that they had all been discarded. The NYPD subsequently disposed of them on November 13, 2025.

262. He spent a significant amount of hard work and money on these items that were all discarded without notice by the NYPD.

## CLASS ACTION ALLEGATIONS

263. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

264. Plaintiffs' respective experiences are not aberrations but exemplify a systemic pattern resulting from the City's policies, customs, and deliberate indifference. The harm is rooted in (1) the continued existence of unconstitutional Administrative Code § 14-140; (2) the City's failure to establish meaningful notice or retrieval mechanisms; (3) the NYPD's and District Attorneys' inconsistent and clandestine internal policies; and (4) the NYPD's persistent refusal to follow rules around issuing invoices or providing any neutral forum to contest classification or retention.

265. The City, by its agencies and officials, including the NYPD Commissioner and Property Clerk, deprived Plaintiffs of their constitutional and statutory rights as a matter of official municipal policy and/or informal custom in a manner so pervasive and widespread as to have the force of law.

266. Defendants have knowingly subjected Plaintiffs to procedures that federal courts have for over five decades condemned as constitutionally deficient. Officials with final

policymaking authority have repeatedly failed to correct these deficiencies, despite multiple judicial mandates.

267. The City has failed to train NYPD officers in constitutionally compliant property procedures and has failed to supervise or discipline officers who withhold invoices, fail to invoice property entirely, misclassify property, or dispose of personal belongings without notice.

268. The City has failed and continues to fail to supervise NYPD officers, including but not limited to failing to discipline officers who violate claimants' constitutional rights through the conduct described above.

269. The City is deliberately indifferent to the known, obvious, and highly predictable consequences that result when officers are not trained, supervised, or disciplined.

270. Plaintiffs and putative Class Members have been injured proximately and directly by the Defendants' action and inaction.

271. Unless restrained by order of this Court, a real and immediate threat exists that the rights of Plaintiffs and putative Class Members will continue to be violated in the future by NYPD's official policies and widespread practices.

272. Plaintiffs bring this action on behalf of themselves and pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class and Subclasses defined as follows:

a. All individuals from October 1, 2024, to the present, whose non-contraband property was seized by the NYPD and (i) the property was seized without a warrant or warrant exception and retained by Defendants; (ii) the individuals failed to receive sufficient notice of procedures for retrieval or status of their seized property; (iii) the seized property was not properly invoiced by the NYPD; (iv) the

seized property was not timely released or returned by Defendants after it was no longer needed as evidence for the related arrest or prosecution, and/or (v) the seized property was damaged, destroyed, or otherwise improperly disposed by the NYPD.

b. Subclass 1: All members whose property was seized and retained without a warrant or a warrant exception by Defendants.

c. Subclass 2: All members who did not receive sufficient notice of procedures for retrieval or of the status of their seized property.

d. Subclass 3: All members whose seized property was not properly invoiced by NYPD.

e. Subclass 4: All members whose seized property was not timely released or returned by Defendants.

f. Subclass 5: All members whose seized property was damaged, destroyed, or otherwise improperly disposed of by Defendants.

273. Plaintiffs reserve the right to amend the Class and Subclasses definitions if further investigation and discovery indicate that such definitions should be narrowed, expanded, or otherwise modified.

274. Excluded from the Class are Defendants City of New York, NYPD Property Clerk, and Commissioner Tisch, and any of their affiliates, agents, legal representatives, employees, or officers, and the judicial officers(s) and any judicial staff overseeing this litigation.

275. This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

276. The four requirements of Rule 23(a) are satisfied:

a. *Numerosity*: Class members are so numerous that their individual joinder is impracticable. The precise number of Class Members and their identities are unknown to Plaintiffs at this time. According to the NYPD's own statistics, over 370,000 property invoices were created in 2025 alone—and many more seizures occurred without any invoice at all, as described herein.

b. *Commonality*: All Class Members share common questions of law and fact, including whether Defendants' policies and practices of seizing, retaining, and seeking to forfeit property violate the United States Constitution, the New York State Constitution, and the New York City Administrative Code. *See infra* ¶ 279.

c. *Typicality*: The claims of the named Plaintiffs are typical of those of the class. Each named Plaintiff, like all Class Members, has been harmed by Defendants' unconstitutional policies and practices of seizure and retention of their personal property and require similar relief.

d. *Adequacy of Representation*: The named Plaintiffs and Class counsel will fairly and adequately represent the interests of the Class. The named Plaintiffs have suffered injury, and their interests are not antagonistic to those of other Class Members. Class counsel has many years of combined experience in complex civil, civil rights, and class action litigation.

277. Declaratory and injunctive relief are appropriate under Rule 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the Class as a whole.

278. Certification for monetary damages is appropriate under Rule 23(b)(3) because common questions of law and fact—including the lawfulness of Defendants' policies and practices and Class Members' entitlement to relief—predominate over any individual questions, including

the calculation of damages specific to each Class Member. While the measure of damages may vary among individual Class Members depending on the nature and value of their property, such individual damages questions do not predominate over the common liability issues shared across the Class. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, as it allows common questions of liability and entitlement to be resolved in a single proceeding, with individual damages determinations addressed at a subsequent stage or through subclass proceedings as appropriate.

279. Under Rule 23(b)(3), common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class Members, including the following:

a. whether Defendants' policies and practices of seizing personal property without issuing invoices, as required by 38 RCNY § 12-32(d), violate the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 6, 7, and 12 of the New York Constitution;

b. whether Defendants' policies and practices of retaining personal property without providing adequate notice of retrieval procedures violate the procedural due process requirements of the Fourteenth Amendment and Article I, Section 6 of the New York Constitution;

c. whether Defendants' systematic failure to issue required property invoices, or refusal to correct errors on invoices, deprives Class Members of meaningful access to any property retrieval process;

d. whether the conflict between New York City Administrative Code § 14-140 and Chapter 12 of Title 38 of the Rules of the City of New York deprives Class Members of constitutionally adequate notice of property retrieval procedures;

e. whether Defendants' creation and application of additional unpublished property categories—including "investigatory" and "Determine True Owner"—without any codified return procedures, violates the constitutional rights of Class Members;

f. whether Defendants' seizure and indefinite retention of property classified as "investigatory," without a warrant, violates the Fourth Amendment and Article I, Section 12 of the New York Constitution;

g. whether Defendants' destruction, auction, or other disposal of Class Members' personal property without notice constitutes a taking without just compensation in violation of the Fifth Amendment to the United States Constitution and Article I, Section 7(a) of the New York Constitution;

h. whether Defendants' policies and practices constitute a pattern and practice of deliberate indifference to the constitutional rights of Class Members;

i. whether Class Members whose property was seized, retained, destroyed, or sold without adequate process or just compensation are entitled to compensatory damages, including for the monetary and sentimental value of such property, and if so, the appropriate measure of such damages; and

j. whether, and to what extent, Class Members are entitled to attorneys' fees, costs, and other relief.

280. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. While damages will vary among individual Class Members

depending on the nature and value of their seized property, the common questions of liability, entitlement to relief, and the lawfulness of Defendants' policies and practices predominate over any individual damages questions. Many Class Members suffered financial harm that, standing alone, would be too small to justify the burden and expense of individual litigation. It would be virtually impossible for all Class Members, on an individual basis, to obtain effective redress for the wrongs done to them. A class action allows the common liability questions to be resolved in a single proceeding, with individual damages determinations—to the extent necessary—addressed at a subsequent stage or through subclass proceedings.

281. Even if Class Members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from a similar set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## CLAIMS

### FIRST CLAIM FOR RELIEF: Violations of Plaintiffs' Due Process Rights
### 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution

(Against All Defendants)

282. Plaintiffs hereby incorporate and repeat the allegations above as if fully set forth herein.

283. The Due Process Clause of the Fifth Amendment requires "that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993).

284. Plaintiffs and the Class have a legitimate interest in the property they own and in the right to timely retake possession of their property from the Defendants. Under the United States Constitution, Plaintiffs and the Class are also entitled to certain safeguards relating to property taken or obtained in connection with an arrest, as held by *McClendon*. 460 F.2d at 116.

285. Defendants, and their agents, employees, officials, and others acting in concert with them, under color of state law, have caused, and will continue to cause, Plaintiffs and putative Class Members to be deprived of their property without due process in violation of their procedural due process rights under the Fourteenth Amendment. Defendants have seized, failed to return, and/or discarded Plaintiffs' property without providing adequate notice. Defendants failed to give warning and sufficient opportunity for Plaintiffs and the Class to collect and remove their belongings before removing and withholding and/or destroying them.

286. The laws, rules, and policies governing property retrieval procedures are inconsistent with each other such that Plaintiffs and the Class lack adequate notice regarding the procedures to retrieve their seized property.

287. The conflict between the Administrative Code and the City Rules deprive Plaintiffs and the Class of meaningful notice because claimants are misled by the requirements set forth in the City Rules that do not exist in the Administrative Code, and Defendants may follow either one.

288. Defendants, and their agents, employees, officials, and others acting in concert with them apply the existing law, rules, and policies inconsistently and enforce the existing laws, rules, and policies unevenly across their various offices. Defendants selectively fail to issue invoices, ignore statutory timelines, and affirmatively withhold critical information such as the location of property, applicable deadlines, and necessary documentation, thereby ensuring that Plaintiffs and the Class cannot secure the return of their seized property.

289. The NYPD and NYPD Property Clerk have a systematic practice of refusing to comply with the mandatory procedures of 38 RCNY § 12-32 through § 12-38, which has deprived and continues to deprive the Plaintiffs and the Class of due process.

290. Defendants also deprived Plaintiffs and putative Class Members of adequate notice and the opportunity to be heard by failing to establish and employ a system by which Plaintiffs and putative Class Members can follow a consistent and straightforward set of rules to retrieve their property or address errors related to their property. Plaintiffs and the Class were also not afforded any process by which they could challenge the deprivation.

291. Defendants therefore failed to provide adequate process, both pre- and post-deprivation.

292. Plaintiffs and the Class suffered harm from the loss and/or destruction of their property without notice or the opportunity to retrieve such property. They lost belongings with monetary value as well as personal items with sentimental value. They expended additional resources to navigate the property retrieval procedures without success. Plaintiffs and the Class are not only unable to use and avail themselves of their property that was seized and destroyed, but they have also not received compensation for the seized or discarded property.

293. Defendants have thereby violated and continue to violate the procedural due process rights of Plaintiffs and the Class. As a direct and proximate result, Plaintiffs and the Class have suffered loss of property and economic harm, for which Defendants are liable under the United States Constitution and 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF: Violations of Plaintiffs' Due Process Rights
**Article I § 6 of the New York Constitution**
(Against All Defendants)

294. Plaintiffs hereby incorporate and repeat the allegations above as if fully set forth herein.

295. Article I, Section 6 of the New York Constitution states that "No person shall be deprived of life, liberty or property without due process of law." N.Y. Const. art. I, § 6.

296. Plaintiffs and the Class have a protected interest in the preservation and return of their property by Defendants. Under the New York Constitution, Plaintiffs and the Class are entitled to certain safeguards relating to property taken or obtained in connection with an arrest or with an investigation unconnected to an arrest, as codified in subchapter B of Chapter 12 of Title 38 of the RCNY.

297. Defendants, and their agents, employees, officials, and others acting in concert with them, under color of state law, have violated, and will continue to violate, the New York Constitution due process rights of Plaintiffs and putative Class Members by seizing, failing to return, and/or discarding their property without providing adequate notice. Defendants failed to give warning and sufficient opportunity for Plaintiffs and the Class to collect and remove their belongings before removing and withholding and/or destroying them.

298. The laws, rules, and policies governing property retrieval procedures are inconsistent with each other such that Plaintiffs and the Class lack adequate notice regarding the procedures to retrieve their seized property.

299. The conflict between the Administrative Code and the City Rules deprived Plaintiffs and the Class of meaningful notice because claimants are misled by the requirements set

forth in the City Rules that do not exist in the Administrative Code, and Defendants may follow either one.

300. Defendants, and their agents, employees, officials, and others acting in concert with them apply the existing law, rules, and policies inconsistently and enforce the existing laws, rules, and policies unevenly across their various offices. Defendants selectively fail to issue invoices, ignore statutory timelines, and affirmatively withhold critical information such as the location of property, applicable deadlines, and necessary documentation thereby ensuring that Plaintiffs and the Class cannot effectuate return.

301. The NYPD and NYPD Property Clerk have a systematic practice of refusing to comply with the mandatory procedures of 38 RCNY § 12-32 through § 12-38, which has deprived and continues to deprive the Plaintiffs and the Class of due process.

302. Defendants also deprived Plaintiffs and putative Class Members of adequate notice and the opportunity to be heard by failing to establish and employ a system by which Plaintiffs and putative Class Members could follow a consistent and straightforward set of rules to retrieve their property or address errors related to their property. Plaintiffs and the Class were not afforded any process by which they could obtain their seized property or challenge the deprivation.

303. Defendants therefore failed to provide adequate process, both pre- and post-deprivation.

304. Plaintiffs and the Class suffered harm from the loss and/or destruction of their property without notice or the opportunity to retrieve such property. They lost belongings with monetary value as well as personal items with sentimental value. They expended additional resources to navigate the property retrieval procedures without success. Plaintiffs and the Class

are not only unable to use and avail themselves of their property that was seized and destroyed, but they have also not received compensation for the seized or discarded property.

305. Defendants' conduct has therefore infringed on Plaintiffs' and putative Class Members' due process rights in violation of Article I, Section 6 of the New York Constitution. As a direct and proximate result, Plaintiffs and the Class have suffered loss of property and economic harm.

**THIRD CLAIM FOR RELIEF: Violations of Plaintiffs' Right to be Free of Unreasonable Seizures**

**42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution**

(Against All Defendants)

306. Plaintiffs hereby incorporate and repeat the allegations above as if fully set forth herein.

307. The Fourth Amendment to the United States Constitution provides the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV.

308. This includes the right to be free from unreasonable searches and seizures that meaningfully interfere with their property interests. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

309. A seizure that is "lawful at its inception" could become "unreasonable because its length unduly intruded upon constitutionally protected interests." *Id*. at 124 & n.25.

310. Defendants and their agents, employees, officials, and others acting in concert with them, including the NYPD and its Property Clerk, under color of state law, have unreasonably searched or seized Plaintiffs' and putative Class Members' property in violation of the Fourth Amendment to the United States Constitution by unlawfully continuing the seizure of personal property without legitimate purpose across all property categories.

311. Additionally, Defendants seize property for allegedly investigatory purposes and retain it indefinitely, without a warrant, in violation of the Fourth Amendment.

312. Defendants' conduct has therefore infringed upon Plaintiffs' and putative Class Members' fundamental rights in violation of the Fourth Amendment to the United States Constitution.

## FOURTH CLAIM FOR RELIEF: Violation of the Right to be Free of Unreasonable Seizures
## Article I § 12 of the New York Constitution
(Against All Defendants)

313. Plaintiffs hereby incorporate and repeat the allegations above as if fully set forth herein.

314. Article I, Section 12 of the New York Constitution provides the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" N.Y. Const. article I, § 12.

315. Because the search and seizure language of the Fourth Amendment and Article I, § 12 is identical, they generally confer similar rights.

316. This includes the right to be free from unreasonable searches and seizures that meaningfully interfere with their property interests. *Jacobsen*, 466 U.S. at 113.

317. A seizure that is "lawful at its inception" could become "unreasonable because its length unduly intruded upon constitutionally protected interests." *Id*. at 124 & n.25.

318. However, "[t]he protections afforded by Article I § 12 of the New York State Constitution to be free from unreasonable searches and seizures are broader than those afforded by the Fourth Amendment" to the United States Constitution. *Bowser v. City of New York*, No. 23-cv-6183 (DG) (VMS), 2025 WL 1707174, at *32 (E.D.N.Y. Feb. 25, 2025).

319. Defendants and their agents, employees, officials, and others acting in concert with them, including the NYPD and its Property Clerk, under color of state law, have unreasonably searched or seized Plaintiffs' and putative Class Members' property in violation of Article I, Section 12 of the New York Constitution by unlawfully continuing the seizure of personal property without legitimate purpose across all property categories.

320. Additionally, Defendants seize property for allegedly investigatory purposes and retain it indefinitely, without a warrant, in violation of Article I, Section 12 of the New York Constitution.

321. Defendants' conduct has therefore infringed upon Plaintiffs' and the putative Class Members' fundamental rights in violation of Article I, Section 12 of the New York Constitution.

## FIFTH CLAIM FOR RELIEF: Violation of the Right of Security Against Unreasonable Search and Seizure

**Title 8, Chapter 8 (§ 8-801, et seq.) of the New York City Administrative Code**

(Against All Defendants)

322. Plaintiffs hereby incorporate and repeat the allegations above as if fully set forth herein.

323. New York City Administrative Code § 8-802 provides the "right of natural persons to be secure in their persons, houses, papers and effects against unreasonable searches and seizures[.]" N.Y.C. Admin. Code § 8-802 (2026).

324. Defendants, as employees of the police department, are "covered individuals" pursuant to New York City Administrative Code § 8-801. N.Y.C. Admin. Code § 8-801 (2026).

325. New York City Administrative Code § 8-803 provides that a covered individual who, under color of law, "subjects or causes to be subjected" any individual "to the deprivation of any right that is . . . protected by section 8-802 is liable . . . to the person aggrieved for legal or equitable relief or any other appropriate relief." N.Y.C. Admin. Code § 8-803 (2026).

326. Plaintiffs and the Class, as individuals subjected to unreasonable searches and seizures, are "persons aggrieved" pursuant to New York City Administrative Code § 8-801. N.Y.C. Admin. Code § 8-801 (2026).

327. Defendants and their agents, employees, officials, and others acting in concert with them, including the NYPD and its Property Clerk, under color of state law, have unreasonably seized Plaintiffs' and putative Class Members' property in violation of the New York City Administrative Code § 8-802 by unlawfully continuing the seizure of personal property without legitimate purpose. Defendants also seize property for allegedly investigatory purposes and retain it indefinitely, without a warrant or any codified procedure for return.

328. The City of New York is liable as the employer of, and based on the conduct of, employees of the police department under New York City Administrative Code § 8-803(b).

329. Plaintiffs and the Class make this claim pursuant to New York City Administrative Code § 8-803(a).

330. As a result of the Defendants' seizure, unlawful retention, and failure to return property to Plaintiffs and the Class, Defendants are liable for compensatory damages, punitive damages, and an order restraining covered individuals from engaging in further conduct in violation. NYC Admin. Code § 8-805.

## SIXTH CLAIM FOR RELIEF: Violation of the Security Against a Taking
## 42 U.S.C. § 1983 and the Fifth Amendment to the United States Constitution
(Against All Defendants)

331. Plaintiffs hereby incorporate and repeat the allegations above as if fully set forth herein.

332. The Fifth Amendment to the United States Constitution provides that "[p]rivate property shall not be taken for public use, without just compensation," a protection made applicable to the States and their political subdivisions through the Fourteenth Amendment.

333. The Fifth Amendment provides a mechanism for relief when police officers "retain [personal property] indefinitely, well after the basis for the warrant has expired." *Kelly v. Bell*, No. 4:22-cv-01940 (MWB), 2023 WL 3161643, at *4 (M.D. Pa. Apr. 28, 2023) (denying-in-part defendant officers and City of Williamsport's motion to dismiss complaint); *see also Frein v. Penn. State Police*, 47 F.4th 247, 251–53 (3d Cir. 2022) ("The police understandably seized the parents' guns in 2014 while a killer was still at large. But he has long since been captured and convicted, and his conviction has been affirmed. The judicial warrant does not authorize keeping the guns past this point. The Constitution requires the officials who are holding on to the guns to pay the parents just compensation and bars them from keeping the guns indefinitely."); *Santander Consumer USA, Inc. v. City of Yonkers*, No. 22-cv-8870 (KMK), 2024 WL 4817649, at *11–13 (S.D.N.Y. Nov. 18, 2024) (finding an unlawful taking of property by the city and granting summary judgment where a vehicle was seized pursuant to an arrest, impounded, deemed abandoned, and transferred title).

334. Defendants, acting under color of state law, seized Plaintiffs' private property, held it indefinitely, and ultimately destroyed or discarded it—without providing just compensation.

335. Defendants' failures prevented Plaintiffs and the Class from securing a property invoice, receiving notice regarding the procedures to follow, receiving notice about the status of their seized property, obtaining a DA Release, and resolving errors in property invoices. These barriers resulted in the permanent deprivation and takings of property and further harm to the Plaintiffs and the Class.

336. The takings of the property of Plaintiffs and the Class were for "public use," because, upon information and belief, the proceeds from such sales are directed, in whole or in part, to NYPD accounts, programs, or initiatives.

337. These takings were not authorized by law, not justified by any continuing law enforcement or evidentiary necessity, and were undertaken pursuant to the Defendant City of New York's official policies and customs.

338. Plaintiffs and putative Class Members have been denied the federal constitutional guarantee of just compensation for property taken for public use.

339. As a direct and proximate result, Plaintiffs and the Class have sustained compensable losses for which Defendants are liable under the United States Constitution.

## SEVENTH CLAIM FOR RELIEF: Violation of the Right Against Uncompensated Takings
**Article I § 7(a) of the New York Constitution**
(Against All Defendants)

340. Plaintiffs hereby incorporate and repeat the allegations above as if fully set forth herein.

341. Article I, Section 7(a) of the New York Constitution provides that "[p]rivate property shall not be taken for public use without just compensation."

342. Defendants, acting under color of state law, seized, retained, auctioned, or otherwise disposed of the property of Plaintiffs and the Class without providing just compensation.

343. The property seized was applied for public use when the property, or proceeds therefrom, was used by the NYPD to fund various NYPD initiatives and programs.

344. Defendants' failures prevented Plaintiffs from securing a property invoice, receiving notice regarding the procedures to follow, receiving notice about the status of their seized property, obtaining a DA Release, and resolving errors in property invoices. These barriers resulted

in the permanent deprivation and takings of the property and further harm to the Plaintiffs and the Class.

345. These takings were not authorized by law, not justified by any continuing law enforcement necessity, and were undertaken pursuant to the City's official policies and customs.

346. Plaintiffs and putative Class Members have been denied the New York State constitutional guarantee of just compensation for property taken for public use.

347. As a direct and proximate result, Plaintiffs and the Class have sustained compensable losses for which Defendants are liable under New York law.

**EIGHTH CLAIM FOR RELIEF: Declaratory and Injunctive Relief**

348. Plaintiffs hereby incorporate and repeat the allegations above as if fully set forth herein.

349. At all relevant times, the Fourteenth Amendment to the United States Constitution has been in full force and effect.

350. The Due Process Clause of the Fifth Amendment requires "that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *James Daniel Good Real Prop.*, 510 U.S. at 48.

351. New York City Admin. Code § 14-140 (1972) violates constitutional due process by (1) not providing meaningful notice regarding how to recover property and (2) placing the burden to initiate recovery proceedings and establish lawful ownership, possession, and use on the claimant. *McClendon,* 460 F.2d at 114–16.

352. Admin Code § 14-140 remains unrepealed and cited in civil forfeiture proceedings despite having been ruled unconstitutional.

353. Without repealing § 14-140, the City added Chapter 12 of Title 38 to the City Rules. These Rules now conflict with § 14-140 while imposing new barriers and lacking meaningful notice requirements, leaving claimants mired in overlapping and contradictory procedures.

354. Chapter 12 of the City Rules itself has failed to fully implement the repeated mandate for improved due process from the courts. The Rules continue to impose the entire burden of retrieval on the claimant, fail to require clear notice of retrieval procedures, and lack any enforcement mechanism to ensure compliance by officials.

355. The City agencies involved in this property seizure scheme—namely the NYPD and District Attorneys—have developed arbitrary and unregulated internal practices, inventing extralegal property categories and practices that operate without oversight.

356. The NYPD routinely fails to comply with even its own inadequate procedures, including failure to issue or correct property invoices, refusal to provide notice, and arbitrary retention or destruction of personal belongings.

357. As a direct and proximate result of the foregoing violations, Plaintiffs and the Class are entitled to declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.

## **JURY DEMAND**

358. Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the putative Class they seek to represent, respectfully request that this Court grant the following relief:

a) Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the proposed Class and Subclasses;

b) Declare that Defendants' policies and practices of seizing, retaining, destroying, or failing to return personal property violate the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Article I, Section 6, 7, and 12 of the New York Constitution;

c) Declare that the NYPD's practice of seizing property under the pretext of "investigatory" purposes without a warrant, and retaining such property indefinitely without due process or judicial oversight, violates the Fourth and Fourteenth Amendments to the United States Constitution;

d) Declare that New York City Admin. Code § 14-140 and 38 RCNY §§ 12-06 and 12-31, et seq. are unconstitutional as applied and on their face;

e) Permanently enjoin Defendants from continuing the challenged policies and practices and require them to establish lawful procedures for the prompt return of non-contraband property or the provision of just compensation;

f) Award compensatory damages to those Class Members whose property was seized, retained, destroyed, or sold without adequate process or just compensation, in individual amounts to be determined at trial or through subsequent proceedings;

g) Award the named Plaintiffs reasonable incentive compensation for their service on behalf of the Class, in amounts to be determined by the Court;

h) Award Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable provisions of law;

i) Award Plaintiffs costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

j) Grant such other and further relief as this Court deems just and proper.

Dated: October 21, 2026

Respectfully submitted,

**WHITE & CASE LLP**

By: *<u>/s/ Isaac Glassman</u>*
Isaac Glassman
1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 819-8554
Fax: (212) 354-8113
Email: iglassman@whitecase.com

**BROOKLYN DEFENDER SERVICES**

By: *<u>/s/ Anca Grigore</u>*
Anca Grigore
Lucas S. Marquez
177 Livingston Street, 7th Floor
Brooklyn, New York 11201
Tel.: (646) 787-3295
Email: agrigore@bds.org
Email: lmarquez@bds.org